## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

REHCO, LLC,

          Plaintiff,

      v.

SPIN MASTER, LTD.,

          Defendant.

Case No. 13-cv-2245

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiff Rehco, LLC has sued Defendant Spin Master, Ltd. for breach of contract and patent infringement. The case is currently before the Court on Spin Master's motion for summary judgment [151]. Also before the Court is Spin Master's motion to preclude Jeffrey Rehkemper and Mike Hirtle from testifying as expert witnesses [145], and Spin Master's motion to preclude certain opinions of Rehco's expert, Dr. Matthew Spenko [148]. For the reasons explained below, the motion for summary judgment is granted in part and denied in part, and the motions related to Rehco's experts are denied without prejudice.

## Background & Procedural History

Rehco, LLC is an Illinois limited liability corporation with its principal place of business in Chicago. DSOF, ¶2. Rehco was founded by two brothers, Steve and Jeffrey Rehkemper, who invent new products for license primarily in the toy industry. Second Amended Complaint [37], ¶¶1-2. Spin Master is a Canadian company with its principal place of business in Toronto. DSOF, ¶1. It is the third

largest toy company in North America; its Air Hogs line of radio-controlled flying products is the largest radio-controlled toy brand in the world and is ranked in the top twenty-five of all brands in the toy industry. SAC [37], ¶¶7-8. Rehco and Spin Master joined forces on various product development projects, and executed at least two development agreements, one related to airplanes and one related to helicopters.

A.    <u>The Airplane Agreement</u>

On December 21, 2000, Rehco and Spin Master entered into a Rechargeable Radio-Controlled Airplane Development Agreement. Second Amended Complaint [37-5]; DSOF, Exhibit 1 [153-1]. The parties executed a First Amendment to that Agreement in September 2001, [37-6], [153-1]; a Second Amendment in January 2003, [37-7]; [153-1]; and a Third Amendment in March of 2003, [37-8], [153-1]. The Agreement, together with the Amendments – collectively referred to as the "Airplane Agreement" – granted Spin Master "a sole and exclusive right to manufacture, have manufactured for it, use, sell, distribute and have distributed for it the 'Item.'" SAC [37], ¶48; Airplane Agreement [37-5], ¶1; DSOF, ¶6, Exhibit 1 [153]. In exchange, Spin Master was obligated "to pay Rehco a royalty of 1.5% on the 'Net Wholesale Selling Price' of all sales of the Item . . ." Second Amended Complaint [37], ¶49; DSOF, Exhibit 1 [153-1].

The description of the "Item" changed over time, with amendments to the Agreement. The initial Agreement referred to an Item called "Rechargeable Radio

Controlled Airplane," described as follows:

> A dual motor controlled flight electric toy airplane having a 19"
> wingspan where each motor is mounted to the wing on either side of
> the fuselage and where these motors are powered by onboard
> rechargeable nicad batteries. Each motor/propeller spins in opposite
> directions and [is] controlled by onboard electronics and radio control
> signals from the handheld controller/transmitter. Simple and reliable
> take-offs are controlled by the electronics whereby the electronics
> further regulate the motor speed during flight unless radio signals are
> received to implement a turn. Motor speed is increased to one motor or
> the other per the controller/transmitter signal for turning.
> Consequently, a "turbo" button is provided on the handheld controller/
> transmitter whereby the plane may receive a signal to both motors for
> burst of straight ahead speed. The nicad batteries are charged by a
> docking station having its own batteries where the same docking
> action resets the electronics for the next takeoff.

[153-1], ¶1.

The parties executed several amendments to the Airplane Agreement,
revising the description of the "Item" each time. On September 1, 2001, the parties
executed an amendment adding a second Item, referred to as "Programmable Flight
Path Plane," described as follows:

> A dual motor controlled flight electric toy airplane having one motor
> mounted to the wing on each side of the fuselage and where those
> motors are powered by onboard rechargeable nicad batteries. Each
> motor/propeller is controlled by onboard programmable electronics.
> Simple and reliable take-offs are controlled by pre-programmed
> electronic control and the programmable portion of the electronics
> further regulate the motor speed during flight. Motor speed is
> increased to one motor or the other using per the programming in
> order to cause turns and altitude changes. The onboard nicad batteries
> are charged by a docking station having its own batteries where the
> same docking station resets the electronics for the next flight and
> where the docking station is equipped to provide the programming
> interface to the plane.

DSOF, ¶8; PRSOF, ¶8.

On January 2, 2003, the parties executed a second amendment, which deleted the Item description from the previous versions and replaced it with an Item referred to as "R/C Stunt Plane," described as a "[r]adio controlled plane using two motors for left and right turning and servo for horizontal stabilizer, which controls up and down movement, having a vertical loop feature." *Id.*

Finally, on March 1, 2003, the parties amended the Agreement to add an Item referred to as the "Mini R/C Defender," described as follows:

> Radio controlled aircraft using two motors to control left and right turning. Airplane features 14" wingspan and has the ability to "climb." The featured control transmitter has a "turbo" button which increases the power to the motors and causes the plane to climb. The remote control transmitter also has a "land" button which decreases the power to the motors and causes the airplane to descend.

*Id.*

The Airplane Agreement allowed Spin Master, "at its sole discretion and at its own expense," to "obtain and maintain patent protection on the ITEM, and any patent rights shall be the property of ASSIGNEE." DSOF, Exhibit 1, ¶3. The Airplane Agreement further granted Spin Master the right to change the form of the Item and to produce and sell such changed forms, provided, however, that all provisions (including the royalty provisions) applied to the new forms:

> ASSIGNEE [Spin Master] has the right to change the form of the Item and to produce and sell it under the new form, provided, however, that all the provisions of this Agreement shall apply to said new form of the Item.

4

Airplane Agreement, ¶7. Although this provision was not included in the amendments, the amendments referenced and incorporated the original Airplane Agreement. *See, e.g.*, 1st Amendment to Airplane Agreement, ¶5.

The Airplane Development Agreement and the separate amendments each included an integration clause. DSOF, ¶10. For example, the Third Amendment provided that the

> Development Agreement, the First Amendment, the Second Amendment and this Third Amendment set forth the entire agreement and understanding of the parties hereto and supersede and merge any prior agreements, arrangements and understandings related to the subject matter herein. There have been no representations or statements, oral or written, that have been relied on by any party hereto, except those expressly set forth in the Development Agreement, the First Amendment, the Second Amendment and this Third Amendment.

*Id.*

On May 25, 2005, Rehco served a demand for royalties on a Spin Master airplane product called the "Dominator"; Rehco demanded royalties under the Airplane Agreement, arguing that the Dominator was a change in form from (or as a product that is derivative of) the Item described as the "Mini R/C Defender." DSOF, ¶11; Exhibit 3. Rehco conceded that, under the Airplane Agreement, Spin Master had the right to change the form of the Item and to produce and sell it under the new form, as long as Spin Master paid royalties on sales of the new Item. DSOF, Exhibit 3.

Spin Master responded that no royalties were owed. DSOF, ¶12; Exhibit 4.

In particular, Spin Master responded that Rehco had done no development work on the Dominator, and that the Dominator did not use any propriety information or any of the lessons from the Defender. *Id.*

On March 26, 2013, Rehco filed this lawsuit, alleging breach of contract and patent infringement. *See* Complaint [1]. The next day, Rehco served written notice of its intent to terminate the Airplane Agreement. DSOF, ¶13; Exhibit 5. Rehco terminated the Airplane Agreement on May 26, 2013 for non-payment. Second Amended Complaint [37], ¶52.

B.    The Helicopter Agreement

On September 1, 2001, Rehco and Spin Master executed a "Radio-Controlled Helicopter Agreement," pursuant to which Rehco agreed to "complete development of the Item described herein." DSOF, ¶19; Exhibit 10; SAC [37-1]. In exchange for an exclusive license on the Item, Spin Master was obligated to pay to Rehco a royalty of 3% on the "Net Wholesale Selling Price of all sales by Spin Master and its Subsidiaries or Affiliates of the Licensed Products." Second Amended Complaint [37], ¶21.

The Helicopter Agreement defined the "Item," identified as a "Radio-Controlled Helicopter," as follows:

> A motorized helicopter toy having a launching base whereby the launching base may function both to charge the batteries in the helicopter and to energize the propeller to sufficient RPM's required for launch. The launching base has batteries and a timer circuit for charging the helicopter and may have a motor for energizing the propeller. The helicopter consists of an airframe, the motorized means

for spinning the propeller, the means for protecting the ends of said spinning propeller, and the means for correcting counter-rotation and pitch variations. The helicopter may have several forms of control, starting with no control or "free flight," or it may be outfitted with electronics having a microprocessor for "preprogrammed" or "programmable" flight or it may be outfitted with a radio receiver for use with a hand held remote transmitter or it may be any combination of the above. The helicopter may or may not take the form of "traditional" helicopter styling and the technology used to make the item fly could be used in other flying toys that are unidentified at this point.

DSOF, Exhibit 10, ¶1.a. The Agreement defined "Licensed Products" to include "merchandise based upon, derived from or embodying the Item, including but not limited to merchandise based upon, derived from or embodying the Item's means for controlling the horizontal stability of the helicopter." DSOF, Exhibit 10, ¶2.g.

The parties executed a First Amendment to the Helicopter Agreement in September 2004 [37-2], and a Second Amendment to that Agreement in July 2006 [37-3]. The First Amendment to the Helicopter Agreement added the "RC Pro Helicopter" and the "RC Mini Helicopter" to the Item description. *See* First Amendment to Radio-Controlled Helicopter Agreement [153-10], p. 1. The Item description from the initial agreement was deleted and replaced with the following:

1.a.i. The "Radio-Controlled Helicopter," described as a radio controlled rechargeable motorized toy helicopter having a single motor for driving both an approximately 14" main rotor and a small geared tail rotor. The main rotor is used for lift and features unique patented safety guards (in front of the rotor blades) as well as stabilizing means in the form of patented offset pivots and counterweights. The tail rotor is used to both offset counter rotation and point the helicopter. The RF electronics feature proportional control for the speed of the motor and the helicopter comes with a base having the means for recharging the batteries on board the helicopter.

1.a.ii. A second item, the "RC Pro Helicopter," described as a radio controlled rechargeable motorized toy helicopter having a single motor for driving both an approximately 16 ½" main rotor and a small geared tail rotor. The main rotor is used for lift and features unique patented safety guards (in front of the rotor blades) as well as stabilizing means in the form of patented offset pivots and counterweights. The tail rotor is used to offset counter rotation. The chassis includes two servos for lifting the main rotor forward, backward, left and right for steering the helicopter. The RF electronics feature proportional control for the speed of the motor and pulsed inputs to servos for easier steering control capability. The helicopter comes with a base having the means for recharging the batters on board the helicopter.

1.a.iii. A third item, the "RC Mini Helicopter," described as a radio controlled rechargeable motorized toy helicopter having two approximately 9" main rotors stacked vertically and where each rotor is individually powered by a single motor and where the tail rotor has been replaced with a large vertical fin for rotational stability. The main rotors are used for lift and feature unique patented safety guards (in front of the rotor blades) as well as stabilizing means in the form of patented offset pivots and counterweights. When the two main rotors are powered at different speeds, they will point the helicopter either right or left. The chassis includes one servo for tilting the lower rotor causing the helicopter to move forward or backward. The RF electronics feature proportional control for the speed of the motors and pulsed inputs to the servo for easier steering control and also may or may not include an electronic gyro. The helicopter comes with a base having the means for recharging the batters on board the helicopter.

First Amendment to Radio-Controlled Helicopter Agreement [153-10], ¶1. The Second Amendment added a fourth item, the "Tethered Helicopter," which was described as: "a remote controlled motorized toy helicopter having two four bladed rotors with safety rings and stacked vertically. One motor powers both rotors. A

power source is tethered to the helicopter from a controller via a wire."  Second Amendment [153-10], ¶1.a.iv.

Like the Airplane Agreement, the Helicopter Agreement permitted modifications to the Item and addressed the applicability of the Agreement to those modifications:

> Any improvement, modification, enhancement or derivation of the Item during the term of the License granted by this Agreement, regardless of how or by whom such improvement, modification, enhancement or derivation is made, will be deemed to be included within the scope of the rights, obligations and reversion provisions of this Agreement, except for Rehco's representations and warranties.

[153-10], ¶1.c.  Similarly, the Agreement gave Spin Master the right to "change the form of the Item and the Licensed Products and to produce and sell them under the new form."  *Id.*, ¶5.b.  With regard to royalties, the Helicopter Agreement provided that the "obligations and the covenants of the Parties to this Agreement" relating to royalties "shall survive the termination of the License and the Agreement, if any." *Id.*, ¶7.j.

On September 12, 2008, Rehco terminated the Helicopter Agreement. Second Amended Complaint [37], ¶24.  Rehco's termination letter suggests that it was terminating the agreement because Spin Master sold "less than 2,500 units for each of two consecutive quarters as indicated in Spin Master Ltd.'s Q1 and Q2 2008 royalty reports and confirmed by the audit currently pending."  DSOF, Exhibit 11 (9/12/08 letter from Steven Rehkemper of Rehco to Ronnen Harary of Spin Master). Rehco's complaint alleges that it terminated the agreement for non-payment.

Second Amended Complaint [37], ¶24.

C.    Litigation History

Rehco initially filed this lawsuit on March 26, 2013 [1], amending its complaint first on April 19, 2013 [16] and again on August 8, 2013 [37].  In the Second Amended Complaint – which is the operative complaint – Rehco alleged breach of contract based upon Spin Master's failure to pay royalties under the Helicopter Agreement (Count I) and the Airplane Agreement (Count III); infringement of U.S. Patent No. 7,100,866 (Count II); and infringement of U.S. Patent No. 6,612,893 (Count IV).  Second Amended Complaint [37].   The Court dismissed Count IV on March 17, 2014 [86].

For its first breach of contract claim, Count I, Rehco alleges that, pursuant to the Helicopter Agreement, it granted Spin Master a "sole and exclusive license to manufacture, have manufactured for it, use, sell, distribute, and have distributed for it the 'Licensed Products' as that term is defined in the Helicopter Agreement"; that, pursuant to the Agreement, Spin Master "was obligated to pay Rehco a royalty rate of 3% on the 'Net Wholesale Selling Price of all sales . . . of the License Products' and on the 'Direct to Consumer Sales Price on all Direct to Consumer Sales'"; and that, "[p]rior to termination by Rehco of the Helicopter Agreement on September 12, 2008 for non-payment, Spin Master had failed to meet its obligations under the Helicopter Agreement, including, but not limited to, failing to pay the royalty rate required by the Agreement."  SAC [37], ¶¶20-24.  Rehco alleges that, as

a result of Spin Master's breach of the Helicopter Agreement, it "has been damaged in an amount greater than $75,000 dollars." *Id.*, ¶24.

For its second breach of contract claim, Count III, Rehco alleges that, pursuant to the Airplane Agreement, it "granted Spin Master a sole and exclusive right to manufacture, have manufactured for it, use, sell, distribute, and have distributed for it the 'Item' as that term is defined in the Airplane Agreement"; that, pursuant to the Agreement, Spin Master "was obligated to pay Rehco a royalty rate of 1.5% on the 'Net Wholesale Selling Price' or all sales of the Item"; and that, "[p]rior to termination by Rehco of the Airplane Agreement on May 26, 2013 for non-payment, Spin Master breached the Airplane Agreement by failing to pay the royalty rate required by paragraph 4 of the Agreement." *Id.,* ¶¶48-52. Rehco alleges that, as a result of Spin Master's breach of the Airplane Agreement, it "has been damaged in an amount greater than $75,000 dollars." *Id.*, ¶52.

Rehco's remaining patent infringement claim, Count III, relates to U.S. Patent No. 7,100,866 (hereinafter, the "'866 patent"), which covers a "control system for a flying vehicle." *See* Second Amended Complaint, Exhibit 4 [37-4]. Rehco alleges both direct infringement and indirect infringement of the '866 patent. More specifically, Rehco alleges that Spin Master directly infringed one or more claims of the '866 patent, including at least claims 1, 2, 10, 11 and 12, by making, using, offering for sale, selling and/or importing auto hover toys that infringe the '866 patent. Second Amended Complaint [37], ¶30. Alternatively, Rehco alleges that

Spin Master indirectly infringed one or more claims of the '866 patent, including at least claims 1, 2, 10, 11 and 12, by inducing others (namely, users of the above products) to use the infringing products in a manner that violates one or more claims of the '866 patent. *Id.*, ¶31.

The parties proceeded with discovery, exchanged initial and final contentions and ultimately submitted to the Court disputed claim terms. On December 11, 2015, the Court issued its claim construction ruling. *See* [125]. Thereafter, Spin Master filed its motion for summary judgment, as well as its motions to preclude or limit the testimony and opinions of certain of Rehco's witnesses. The parties briefed all of these motions, and they are now ripe for resolution.

## Discussion

Spin Master has moved for summary judgment on Rehco's breach of contract and patent infringement claims, and has also moved to preclude or limit the evidence offered by certain Rehco witnesses. The Court considers the motions in turn below.

## A.     Rehco's Breach of Contract Claims

Spin Master first argues that it is entitled to summary judgment on Rehco's breach of contract claims. Spin Master argues that Rehco's breach of contract claims are premised on "flatly ignoring the Item descriptions in the parties' contracts" and must accordingly be rejected. Rehco, on the other hand, argues that, if anyone is attempting to rewrite the parties' contracts, it is Spin Master. Rehco

argues that Spin Master's interpretation of the agreements is inconsistent with their plain language, and that issues of fact remain concerning whether the accused products are derivative of the items as defined in the agreements.

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *See CTL ex rel. Trebatoski v. Ashland School District*, 743 F.3d 524, 528 (7th Cir. 2014).

To win on its breach of contract claims, Rehco would be required to prove: (1) the existence of a valid and enforceable contract; (2) performance by Rehco; (3) a breach by Spin Master; and (4) resultant injury to Rehco. *See, e.g., Hess v. Bresney*, 784 F.3d 1154, 1158-59 (7th Cir. 2015), *quoted in Haywood v. Chicago Hous. Auth.*, No. 15 C 8317, 2016 WL 5405052, at *12 (N.D. Ill. Sept. 28, 2016). The parties do not dispute the existence of valid and enforceable contracts, and there is no dispute about Rehco's performance. The dispute here is whether the parties' agreements

required Spin Master to pay royalties on certain accused products as claimed by Rehco. In resolving this issue, the Court turns first to the language of the contracts.

1.  Contract Language

Contracts "must be construed as a whole, viewing each provision in light of the other provisions." *United States v. Rogers Cartage Co.*, 794 F.3d 854, 861 (7th Cir. 2015) (quoting *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011)). The Court's "'primary objective in construing a contract is to give effect to the intent of the parties.'" *Lane v. Le Brocq*, No. 15 C 6177, 2016 WL 5955536, at *2 (N.D. Ill. Oct. 12, 2016) (quoting *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007)). Unambiguous contract terms must be given their "plain and ordinary meaning." *Lane*, 2016 WL 5955536, at *2 (quoting *QuickClick Loans, LLC v. Russell*, 943 N.E.2d 166, 172 (Ill. App. Ct. 2011)).

A contract is considered ambiguous only if it is unclear or susceptible to more than one reasonable meaning. *Gallagher*, 874 N.E.2d at 58. Whether a contract is "ambiguous is a question of law." *Cent. Contracting, Inc. v. Kenny Constr. Co.*, No. 11 C 9175, 2015 WL 832267, at *3 (N.D. Ill. Feb. 25, 2015) (citing *Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 214 (Ill. 2004)). But a contract "is not necessarily unambiguous when each party insists that the language unambiguously supports its position, and a contract is not necessarily ambiguous merely because the parties disagree on its meaning." *Id.* (citing *Cent. Ill. Light*, 821 N.E.2d at 214).

Here, Rehco claims the Airplane and Helicopter Agreements required Spin

Master to pay royalties on certain products, and Spin Master failed to do so. Spin Master claims that no royalties are required on the accused products. The agreements themselves identify the products on which Spin Master was required to pay royalties. As explained above, the parties' agreements specifically identify the "Items" and "Licensed Products" for which royalties would be owed.

   a.   The Airplane Agreement

Because the parties executed the Airplane Agreement before the Helicopter Agreement, the Court begins with the Airplane Agreement. As explained above, the Airplane Agreement granted Spin Master "a sole and exclusive right to manufacture, have manufactured for it, use, sell, distribute and have distributed for it the 'Item.'" SAC [37], ¶48; Airplane Agreement [37-5], ¶1; DSOF, ¶6, Exhibit 1 [153]. In exchange, Spin Master was obligated "to pay Rehco a royalty of 1.5% on the 'Net Wholesale Selling Price' of all sales of the Item . . ." Second Amended Complaint [37], ¶49; DSOF, Exhibit 1 [153-1]. Initially, the "Item" was defined as a "Rechargeable Radio Controlled Airplane," described as follows:

> A dual motor controlled flight electric toy airplane having a 19" wingspan where each motor is mounted to the wing on either side of the fuselage and where these motors are powered by onboard rechargeable nicad batteries. Each motor/propeller spins in opposite directions and [is] controlled by onboard electronics and radio control signals from the handheld controller/transmitter. Simple and reliable take-offs are controlled by the electronics whereby the electronics further regulate the motor speed during flight unless radio signals are received to implement a turn. Motor speed is increased to one motor or the other per the controller/transmitter signal for turning. Consequently, a "turbo" button is provided on the handheld controller/transmitter whereby the plane may receive a signal to both

motors for burst of straight ahead speed. The nicad batteries are charged by a docking station having its own batteries where the same docking action resets the electronics for the next takeoff.

[153-1], ¶1.  Later, the parties added a second "Item" referred to as "Programmable Flight Path Plane," described as follows:

A dual motor controlled flight electric toy airplane having one motor mounted to the wing on each side of the fuselage and where those motors are powered by onboard rechargeable nicad batteries.  Each motor/propeller is controlled by onboard programmable electronics. Simple and reliable take-offs are controlled by pre-programmed electronic control and the programmable portion of the electronics further regulate the motor speed during flight. Motor speed is increased to one motor or the other using per the programming in order to cause turns and altitude changes. The onboard nicad batteries are charged by a docking station having its own batteries where the same docking station resets the electronics for the next flight and where the docking station is equipped to provide the programming interface to the plane.

DSOF, ¶8; PRSOF, ¶8.  On January 2, 2003, the parties executed an amendment, which scrapped the prior Item descriptions and replaced them with an Item referred to as "R/C Stunt Plane," described as a "[r]adio controlled plane using two motors for left and right turning and servo for horizontal stabilizer, which controls up and down movement, having a vertical loop feature." *Id.*  On March 1, 2003, the parties amended the Agreement to add an Item referred to as the "Mini R/C Defender," described as follows:

Radio controlled aircraft using two motors to control left and right turning.  Airplane features 14" wingspan and has the ability to "climb." The featured control transmitter has a "turbo" button which increases the power to the motors and causes the plane to climb. The remote control transmitter also has a "land" button which decreases the power to the motors and causes the airplane to descend.

*Id.*

The Airplane Agreement also granted Spin Master the right to "change the form of the Item and to produce and sell it under the new form; in that instance, however, "all the provisions of this Agreement shall apply to said new form of the Item." Airplane Agreement, ¶7. Thus, under the plain language of the Airline Agreement, Spin Master was required to pay royalties on all products that fell within the descriptions of the various "Items," as well as any products that were changes in form of any Item.

The particular products at issue under the Airplane Agreement are: Jet Set, A-10 Warthog, RC Dominator, Osprey and Hawk Eye Blue Sky. *See* DSOF, ¶14; PSOF, ¶14; PSOAF Exhibit 2 (Stipulation) [166-2], ¶3. The parties have stipulated that none of these products meet the Item descriptions in the Airplane Agreement, and that Rehco's breach of contract claim is based instead upon the "change in form" language from ¶7. DSOF ¶17, PSOF, ¶17. That provision reads as follows:

> ASSIGNEE has the right to change the form of the ITEM and to produce and sell it under the new form, provided, however, that all the provisions of this Agreement shall apply to said new form of the ITEM.

DSOF, Exhibit 8 (quoting Airplane Agreement, paragraph 7). Thus, to survive summary judgment, Rehco must produce evidence from which a reasonable jury could conclude that the accused products are "changes in form" of an identified Item.

In 2005, when the parties were disputing royalties owed on one of the

accused airplane products (the Air Hogs RC Dominator), Rehco advised Spin Master that, in its view, the Dominator was derivative of the "mini RC Defender." *See* DSOF, Exhibit 3 (5/25/05 email from Scott Lloyd of Rehco to Chris Harris of Spin Master). Spin Master disagreed and took the position that no royalty was payable on the Dominator. In a letter to Rehco, Spin Master advised that "the only similarities are that it is 14" wide when viewed from above and uses 2 motors." DSOH, Exhibit 4 (6/10/05 email from Chris Harris of Spin Master to Scott Lloyd of Rehco). More specifically, Spin Master noted:

> There is nothing proprietary in the Defender with the exception that the aesthetics of the plane is a scaled down Intruder. No development work was done by Rehco on the Dominator item nor is it a simple rework of the Defender. In summary, the Dominator,
>
> - does not use any proprietary information or any of the lessons from the Defender
>
> - employs differential thrust only
>
> - does not use an auto take-off feature
>
> - does not have a conventional wing...it is a delta lifting body.
>
> - the size (14" width) was reduced from the original configuration for marketing reasons (box & cost) .
>
> - aerodynamic principles that make the dominator fly are drastically different from that of the defender
>
> - it is a pusher prop aircraft & it uses different motors than the Defender

*Id.*

In response to Spin Master's summary judgment motion, Rehco has offered

an expert report from Mike Hirtle, which explains that the RC Dominator, the Jet Set, and the A10 Wart Hog are all derivative of the RC Intruder or the original Intruder. *See* Expert Report of Mike Hirtle, ¶¶29, 30, 31. Neither the Intruder, nor the RC Intruder is named in the Agreement. But Hirtle explains that this was the name given to the first airplane Rehco developed for Spin Master. Hirtle also opines that the Hawk Eye Blue Sky, though it includes features that are "outside the scope of the original development," is nonetheless derivative of the original Intruder and the Item described in the Airplane Agreement. *Id.*, ¶34. Although questions remain regarding the quality of this evidence, Hirtle's opinions are enough to create an issue of fact on the question of whether these products fall within the scope of the Airplane Agreement.

As such, Spin Master has moved to preclude Hirtle's report, arguing that Hirtle's opinions should be stricken because he admitted he did not review the relevant provisions of the agreements and failed to compare the accused products to the language of the Item descriptions in the agreements. Though true, at least with respect to the Helicopter Agreement, Hirtle also testified that, in his view, the accused products were just different forms of the Items, suggesting that as long as he had an understanding of the underlying Items – whether from his own experience or from reading the Item descriptions – he could properly compare the accused products to the covered products. *See* Deposition of Mike Hirtle taken 5/10/16, p. 75. Although it is a close call, the record at this stage of the proceedings

does not provide a sufficient basis to preclude Hirtle's testimony and opinions concerning the derivative nature of the accused products. Should this case proceed to trial, Spin Master remains free, of course, to cross-examine Hirtle at length about the bases for his opinions.

Hirtle is of no use to Rehco, however, when it comes to the Osprey. Hirtle opined that the Osprey does not fall within the scope of the Airplane Agreement and no royalty is owed by Spin Master to Rehco for sales of the Osprey. *See* Expert Report of Mike Hirtle, ¶33.[1] Accordingly, the Court finds that Rehco cannot prove that Spin Master was required to pay any royalty on the Osprey, and cannot prove any breach of contract stemming from the failure to pay such royalties. Spin Master is entitled to summary judgment on Rehco's claim for breach of the Airplane Agreement as to the Osprey.

As of this moment, however, issues of fact remain as to whether the other accused airplane products fall within the scope of the Airplane Agreement in that they are derivative of an identified "Item."

b.    The Helicopter Agreement

As explained above, the parties executed the Helicopter Agreement on September 1, 2001; under the Agreement, Rehco granted Spin Master an exclusive license on the "Item," in exchange for Spin Master's payment of royalties at a rate of 3% on the "Net Wholesale Selling Price of all sales by Spin Master and its

---

[1] Hirtle's Report includes two paragraphs numbered as 33. This is the second one, appearing between paragraphs 34 and 35.

Subsidiaries or Affiliates of the Licensed Products." Second Amended Complaint [37], ¶21. The Agreement defined the "Item," initially as a "Radio-Controlled Helicopter," DSOF, Exhibit 10, and later adding the "RC Pro Helicopter," the "RC Mini Helicopter," and the "Tethered Helicopter." *See* First Amendment to Radio-Controlled Helicopter Agreement [153-10], p. 1; Second Amendment [153-10], ¶1.a.iv. The Agreement defined "Licensed Products" to include "merchandise based upon, derived from or embodying the Item, including but not limited to merchandise based upon, derived from or embodying the Item's means for controlling the horizontal stability of the helicopter." DSOF, Exhibit 10, ¶2.g.

Like the Airplane Agreement, the Helicopter Agreement permitted modifications to the Item and addressed the applicability of the Agreement to those modifications:

> Any improvement, modification, enhancement or derivation of the Item during the term of the License granted by this Agreement, regardless of how or by whom such improvement, modification, enhancement or derivation is made, will be deemed to be included within the scope of the rights, obligations and reversion provisions of this Agreement, except for Rehco's representations and warranties.

[153-10], ¶1.c. Similarly, the Helicopter Agreement gave Spin Master the right to "change the form of the Item and the Licensed Products and to produce and sell them under the new form." *Id.*, ¶5.b.

The particular products at issue under the Helicopter Agreement are: AppCopter, Havoc Heli, Heli Cage, Heli Cube, Heli Twister, Heli Replay, Fly Crane, Gyroblade, Saw Blade, Sharp Shooter, Bell222, Hover Assault, Battle Tracker Elite,

Megabomb Black Hawk, Sharp Shooter Hydro, Havoc R, Drop Strike, and Heli Cage Armored Edition. DSOF, ¶29; PSOF, ¶29; PSOAF, Exhibit 2 (Stipulation) [166-2], ¶1. Once again, the parties have stipulated that these products do not fall within the scope of the Item definitions. *See* DSOF, Exhibit 8. Rather, Rehco contends that the products noted above trigger the royalty obligation because they are derivative of the Items identified in the Helicopter Agreement.

Although the Airplane and Helicopter Agreements are similar in many respects, they differ in one important respect. The Helicopter Agreement, unlike the Airplane Agreement, limits the "change in form" provision to the life of the Agreement. Thus, by the plain language of the Agreement, royalties are only required if the "improvement, modification, enhancement or derivation of the Item" occurs during the term of the License:

> Any improvement, modification, enhancement or derivation of the Item **during the term of the License granted by this Agreement**, regardless of how or by whom such improvement, modification, enhancement or derivation is made, will be deemed to be included within the scope of the rights, obligations and reversion provisions of this Agreement, except for Rehco's representations and warranties.

[153-10], ¶1.c. (emphasis added).

It is undisputed that Rehco terminated the Helicopter Agreement and the License on September 12, 2008. Second Amended Complaint [37], ¶24; DSOF, Exhibit 11 (9/12/08 letter from Steven Rehkemper of Rehco to Ronnen Harary of Spin Master). It is further undisputed that all of the above helicopter products, with the exception of the Havoc Heli, were released *after* Rehco terminated the

Helicopter Agreement. DSOF, ¶¶30-31; PSOF, ¶¶30-31. Thus, to the extent these products can be considered to be an improvement, modification, enhancement or derivation of the Item, they were not such things during the term of the License. Rehco has provided no evidence that any of these accused products were developed, manufactured, sold or used during the term of the License. Accordingly, Rehco cannot show that Spin Master was obligated to pay royalties on any of these products, and cannot show that Spin Master breached the Helicopter Agreement by failing to pay royalties on any of these products.

In light of the above, this Court grants summary judgment in Spin Master's favor on Rehco's claim for breach of the Helicopter Agreement (Count I) as to the following products: AppCopter, Heli Cage, Heli Cube, Heli Twister, Heli Replay, Fly Crane, Gyroblade, Saw Blade, Sharp Shooter, Bell222, Hover Assault, Battle Tracker Elite, Megabomb Black Hawk, Sharp Shooter Hydro, Havoc R, Drop Strike and Heli Cage Armored Edition.

That leaves just the Havoc Heli. In response to Spin Master's motion for summary judgment, Rehco argues that issues of fact exist as to whether this product is actually derivative of the Item. Rehco admits that the Havoc Heli does not possess the elements defined in the Item description. *See* Rehco's Response [167], p. 7. Rehco argues, however, that a reasonable jury could find that the removal of such elements could constitute an "improvement, modification, enhancement or derivation of the [RC Mini Helicopter]." *Id.* Indeed, Rehco argues,

any differences that may exist between this product and the Item description remain derivative. The only evidence in the record to support a finding that the Havoc Heli is derivative of an Item again comes from Mike Hirtle.[2] Hirtle opined that the Havoc Heli represents an improvement, modification, enhancement or derivation of the Item." Hirtle Report, ¶52. Although Hirtle's testimony is not terribly compelling, genuine issues of material fact remain as to whether Rehco may proceed on its claim for breach of the Helicopter Agreement as to the Havoc Heli.

### 2.  Additional Issues Relating to the Breach of Contract Claims

Before leaving Rehco's breach of contract claims, the Court is compelled to discuss two additional issues. The first is Spin Master's claim that Rehco is not entitled to post-termination royalties; and the second is the impact of the parties' prior royalty negotiations on the present claims.

---

[2] Rehco also offers the testimony of Jeffrey Rehkemper, who has taken the position that the accused products fall within the scope of the agreements simply because they are helicopters and airplanes. Rehkemper testified that if Spin Master makes *any* helicopter, it would be required to pay royalties on it under paragraph 1.c. *See* DSOF, Exhibit 9 (Deposition of Jeffrey Rehkemper taken 5/5/16), pp. 18-19. And, similarly, Rehkemper testified that, if Spin Master makes *any* airplane, it would fall under the Airplane Agreement. *Id.*, p. 19. Consistent with this extreme view, Rehkemper testified that he never analyzed the accused products in the context of the Agreements to determine whether they actually fell within the scope of the covered Item definitions or even whether they constituted improvements or modifications to the covered Items. In his opinion, there was no need for such a comparison. In fact, when asked to compare an accused product to the Sky Patrol, the first helicopter Rehco developed for Spin Master, he was unable to link them in any significant way, noting: "they're both helicopters, and they both have tail rotor. That's about it." Jeffrey Rehkemper Dep. taken 1/28/16 [153-27], p. 27. To the extent Rehkemper's claim is espoused by Rehco, it is rejected; this broad interpretation finds no purchase in the language of the contracts.

a.    Post-Termination Royalties

As explained above, Rehco terminated the Helicopter Agreement on September 12, 2008, and it terminated the Airplane Agreement on May 26, 2013. Spin Master argues that it is entitled to summary judgment on any claim for post-termination royalties. Spin Master argues that royalties were required under the agreements only during the life of those agreements; once they were terminated, no further royalties were owed. Rehco argues that post-termination royalties are required because Rehco is entitled to the benefit of its bargain – that is, had Spin Master not failed to pay royalties, Rehco would not have terminated the contacts and royalties would still be owed.

Turning again to the language of the agreements, the Court cannot say that Rehco is wrong. According to the agreements, once a product is deemed to fall within the scope of coverage, whether because the product falls within the definition of "Item" or because it is determined to be derivative of an Item, royalties are owed on all sales – whether or not those sales occur during the life of the agreement. *See* DSOF, Exhibit 1 (Airplane Agreement), ¶4 ("ASSIGNEE shall pay DEVELOPER a royalty . . . on *all* sales of the ITEM by ASSIGNEE"); DSOF, Exhibit 10 (Helicopter Agreement), ¶7.b. ("Except as otherwise provided by this Agreement, Spin Master shall pay Rehco a royalty at the Royalty Rate on the Net Wholesale Selling Price of *all* sales by Spin Master and its Subsidiaries or Affiliates of the Licensed Products.") (emphasis added). Nothing in the royalty provision suggests that post-

termination sales are exempt from the royalty requirement. Indeed, the Helicopter Agreement expressly provides that the "obligations and covenants of the Parties to this Agreement under this Article 7 of this Agreement [the article entitled "Royalties"] . . . shall survive the termination of the License and the Agreement, if any." DSOF, Exhibit 10 (Helicopter Agreement), ¶7.j. Accordingly, the Court cannot grant Spin Master summary judgment under this theory.

b.   The Impact of the Parties' 10/8/10 Royalty Settlement

As noted above, based upon an analysis of the contract language, the Court has determined that issues of fact exist as to whether Spin Master was required to pay royalties on the Havoc Heli (under the Helicopter Agreement) and on the Jet Set, A-10 Warthog, RC Dominator, and Hawk Eye Blue Sky (under the Airplane Agreement). Nevertheless, another contract also impacts this Court's analysis.

In 2008, Rehco engaged the Royalty Compliance Organization to conduct an audit of royalties paid and owed by Spin Master. On October 8, 2010, after negotiating the matter for more than a year, Spin Master and Rehco executed a "Settlement and Release Agreement" resolving their ongoing dispute about royalties. In particular, this Agreement resolved the parties' disputes concerning royalties owed under the Airplane Agreement and the Helicopter Agreement, among other licenses. Pursuant to the Settlement and Release Agreement, Spin Master agreed to pay Rehco $200,000, and Rehco agreed to release "all claims, counterclaims, demands, damages, debts, liabilities, accounts, actions and causes of

action, known or unknown, liquidated or contingent, which are related to the Audit and Additional Selling Periods, **and any claims for royalties thereunder (other than the Spin Master obligations under this Agreement) which arose, existed, or could have been asserted prior to the Effective Date."** DSOF, Exhibit 20 (Settlement and Release Agreement dated 10/8/10) (emphasis added).

Spin Master argues that the 2008 royalty audit, and the parties' agreement to resolve it, preclude Rehco from asserting its breach of contract claims here. In response, Rehco argues that the audit and release were limited to the product SKUs identified in the audit report. As a result, Rehco contends, products such as the Havoc Heli and the Dominator, which were not included in that report, cannot fall within the scope of the release. Rehco also argues that the release would not apply to any sales of covered products that occurred post-Q2 2010, i.e., after the Additional Selling Period.

After reviewing the release, the Court agrees, in part, with Spin Master. Rehco's argument ignores the language of the release, which is broader that the SKU numbers and contemplates resolution of additional products and selling periods. "A release is a contract." *Heard v. Tilden*, 809 F.3d 974, 979 (7th Cir. 2016), and every bit as binding on the parties. Here, the parties executed broad releases; Rehco's provided as follows:

> Subject to the representations and warranties below, Rehco hereby releases and forever discharges Spin Master, its subsidiaries and any officers or directs or and from any and all claims, counterclaims, demands, damages, debts liabilities, accounts, actions and causes of

action, known or unknown, liquidated or contingent, which are related
to the Audit and Additional Selling Periods, and any claims for
royalties thereunder (other than the Spin Master obligations under
this Agreement) which arose, existed, or could have been asserted prior
to the Effective Date.

DSOF, Exhibit 20 [153-20], ¶5. By its terms, the Settlement and Release

Agreement's effective date was October 8, 2010. *See id.*, p. 1. It is undisputed that

both the Havoc Heli and the RC Dominator were released in 2006. These products

would have been on the market for at least two years when Rehco initiated the

royalty audit, and they would have been on the market for four years when the

parties negotiated and resolved the audit and executed the Settlement and Release

Agreement. As such, a claim for breach of contract and royalties on these products

either was, or could have been, asserted prior to the Effective Date. In fact, it is

undisputed that Rehco elected to remove its claims for royalties on the Havoc Heli

and Dominator products during the audit. DSOF, ¶36; PSOF, ¶36. As a result, any

claim for royalties on the Havoc Heli or Dominator is precluded.

The record shows, however, that the other products – namely, the Jet Set, the

A-10 Warthog and the Hawk Eye Blue Sky – were all released after Rehco initiated

the audit and, in some cases, after the effective date of the release. The Jet Set was

released in 2009; the A-10 Warthog was released in 2010; and the Hawk Eye Blue

Sky was released in 2011. Absent additional evidence, the Court cannot infer that

these products were included in the audit or that claims for royalties on these

products arose, existed, or could have been asserted prior to the Settlement and

Release Agreement's October 8, 2010 effective date.

In sum, for all of the reasons explained above, the Court finds that Rehco cannot prevail on its claim for breach of the Helicopter Agreement as to any of the accused products, and summary judgment in Spin Master's favor on this claim (Count I) is, therefore, appropriate. Additionally, the Court finds that Rehco cannot prevail on its claim for breach of the Airplane Agreement as to the Osprey and the RC Dominator, and thus grants summary judgment in Spin Master's favor on this claim (Count III) as to these products. Spin Master is not entitled to summary judgment on Rehco's breach of contract claim as to the Jet Set, A-10 Warthog or Hawk Eye Blue Sky airplane products, however, because issues of fact remain as to whether these products fall within the scope of the Airplane Agreement, and as to whether Spin Master owed royalties on them.

B.    Rehco's Patent Infringement Claim

In its operative complaint, Rehco alleges that Spin Master has directly and indirectly infringed the '866 Patent. In particular, Rehco alleges that Spin Master has directly infringed at least claims 1, 2, 10, 11 and 12 of the '866 Patent by "making, using, offering for sale, selling and/or importing auto hover toys that infringe the '866 patent including, but not limited to the Air Hogs Vectron Wave, Air Hogs Vectron Wave Battle, Flutterbye Flying Fairy and Atmosphere products." SAC [37], ¶30. Rehco further alleges that Spin Master indirectly infringed as least claims 1, 2, 10, 11 and 12 by inducing others (e.g., users of the '866 Accused

Products) to use the '866 Accused Products in a manner that violates one or more claims of the '866 patent. *Id.*, ¶31. For example, Spin Master provides instruction manuals with the products that instruct and encourage end users to use the products. *Id.*, ¶35. Spin Master has moved for summary judgment on the basis of both noninfringement and invalidity.

As more fully explained below, the Court finds that Spin Master is entitled to summary judgment of noninfringement, because every limitation recited in the specified claims cannot be found in the accused products. In particular, the accused products do not employ "a signal" as recited in claims 1, 2, 10, 11 and 12, and do not employ the "control system" recited in claim 1.

1. Noninfringement

Spin Master first argues that its products do not, as a matter of law, infringe the asserted claims. More specifically, Spin Master argues, Rehco has no evidence that the "control system" element of the asserted claims is present in Spin Master's products. Spin Master also argues that the asserted claims require a single signal, whereas Spin Master's products use multiple signals simultaneously.

Infringement, "whether literal or under the doctrine of equivalents, is a question of fact." *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129–30 (Fed. Cir. 2011). Summary judgment of noninfringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim is found in the accused device either literally or under the doctrine of

equivalents. *Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*, 808 F.3d 1313, 1317 (Fed. Cir. 2015); *PC Connector Sols., LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005). To establish literal infringement, "every limitation set forth in a claim must be found in an accused product, exactly," whereas under the doctrine of equivalents infringement occurs when "there is equivalence between the elements of the accused product . . . and the claimed elements of the patented invention," *Microsoft Corp. v. GeoTag, Inc.*, 817 F.3d 1305, 1313 (Fed. Cir.), *cert. denied sub nom. GeoTag, Inc. v. Google Inc.*, 137 S. Ct. 313 (2016) (citing *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995); *Duramed Pharm., Inc. v. Paddock Labs., Inc.*, 644 F.3d 1376, 1380 (Fed. Cir. 2011)).

An infringement analysis requires two steps: claim construction and comparison of the alleged infringing product with the patent claims. *See Markman v. Westview Instr., Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995); *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1387-89 (Fed. Cir. 1992). Although the Court previously construed the parties' disputed claim language, *see* Memorandum Opinion & Order, 12/11/15 [125], the present motion requires the Court to consider an additional issue – that is, whether the control system disclosed in the invention is limited to a transmitter that transmits one single signal, or whether the invention is broad enough to cover a transmitter that transmits multiple signals. Curiously, the parties never raised this issue during claim construction.

In a summary judgment setting, comparison of the claims with the accused

devices requires a determination that "a reasonable trier of fact could find that every limitation in every construed claim at issue" is found in the infringing products. *Unidynamics Corp. v. Automatic Prods. Int'l, Ltd.*, 157 F.3d 1311, 1316-17 (Fed. Cir. 1998). A patent is infringed if "a single claim is infringed." *Intervet America, Inc. v. Kee-Vet Lab., Inc.*, 887 F.2d 1050, 1055 (Fed. Cir. 1989); *see also Deering Precision Instr., LLC v. Vector Distrib. Sys.*, 347 F.3d 1314, 1324 (Fed. Cir. 2003). Literal infringement of a specific claim, in turn, exists when "every limitation cited in the claim is found in the accused device, i.e., when the properly construed claim reads on the accused device exactly." *Amhil Enters. v. Wawa, Inc.*, 81 F.3d 1554, 1562 (Fed. Cir. 1996).

Rehco has the burden of proving that Spin Master's products meet every element of an asserted claim. If Rehco fails to offer sufficient proof to meet any element of the asserted claim, Spin Master is entitled to summary judgment on Rehco's infringement claim. Thus, in ruling on Spin Master's motion, the Court must compare the construed claims in Rehco's patent to Spin Master's accused products. *Medgraph, Inc. v. Medtronic, Inc.*, 843 F.3d 942, 949 (Fed. Cir. 2016) ("Evaluation of summary judgment of noninfringement is a two-part inquiry: first, a court construes the scope and meaning of the asserted patent claims, and then compares the construed claims to the accused product or process.") (citing *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009)).

The '866 patent relates to hovercraft toys and discloses a "Control System for

a Flying Vehicle." It recites 17 claims in "means-plus-function" terms. Rehco has accused Spin Master of infringing claims 1, 2, 10, 11 and 12. Claims 1 and 10 are independent; claim 2 depends from claim 1, and claims 11 and 12 depend from claim 10.

The parties previously identified disputed claim terms, and each side proposed a particular construction of those terms. After considering the parties' briefs and arguments, the Court previously construed the parties' disputed claim language as follows:

| Disputed Claim Term | Court's Construction |
|---|---|
| "first means to set the speed of the propelling means to a first speed when the receiver receives the bounced signal" | Function: to set the speed of the propelling means to a first speed when the receiver receives the bounced signal<br><br>Structure: Circuit Board **136** programmed to set the speed of the propelling means to a first speed when the receiver receives the bounced signal or equivalents thereof |
| "second means to set the speed of the propelling means to a second speed when the receiver does not receive the bounced signal" | Function: to set the speed of the propelling means to a second speed when the receiver does not receive the bounced signal<br><br>Structure: Circuit Board **136** programmed to set the speed of the propelling means to a second speed when the receiver does not receive the bounced signal or equivalents thereof |

For purposes of the present dispute, some additional claim construction appears to be required, as the parties' dispute involves two new issues: whether the

signal recited in the claims is limited to a single signal and whether the control system recited in the claims is limited to the two-step decision tree articulated above.

Claim 1 discloses:

A vehicle having a means for propelling in a vertical direction, further comprising:

> a transmitter positioned on the bottom of said vehicle for transmitting **a signal** from the vehicle downwardly away from said vehicle;

> a receiver positioned on the bottom of said vehicle for receiving **said signal** as it is bounced off of a surface, defined as **a bounced signal**; and

> a control system that automatically sets a speed of the propelling means in response to the receiver, said control system having a first means to set the speed of the propelling means to a first speed when the receiver receives **the bounced signal** and the control system having a second means to set the speed of the propelling means to a second speed when the receiver does not receive **the bounced signal**, the first speed being predefined as a speed that causes the vehicle to gain altitude and the second speed being predefined as a speed that causes the vehicle to lose altitude.

'866 Patent, col. 7, line 55 – col. 8, line 6.    The record shows that the accused products (the Vectron Wave, the Vectron Wave Battle, the Atmosphere, and the Flutterbye Fairy) all have a transmitter, a receiver and a control system.  It is undisputed that the accused products all employ multiple signals, and not a single signal.

Rehco argues that it has presented three theories as to how the accused auto-hover products meet the control system limitation in claim 1, and that, under each

theory, a genuine issue of material fact exists precluding the entry of summary judgment. Rehco's Response [167], p. 16.

For its first infringement theory, Rehco argues that claim 1 of the '866 patent is not limited to a single signal, but may also cover multiple signals. Rehco agrees that the accused products transmit and receive a series of signals. *Id.*; PSOF, ¶20. Thus infringement under Rehco's first theory turns upon whether the language of claim 1 may be construed to cover just a single signal, or whether it may be construed to cover one or more signals. Claim terms are construed, not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).

The Federal Circuit has held that the use of a singular indefinite article with a claim feature may support an interpretation of "one or more" of those claim features. *See, e.g., Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1342 (Fed. Cir. 2016); *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1350 (Fed. Cir. 2005). In *Baldwin Graphic Systems, Inc. v. Siebert*, 512 F.3d 1338, 1342 (Fed. Cir. 2008), the Federal Circuit articulated the general rule that the use of the indefinite article "a" means "one or more"; it noted that the court had

> repeatedly emphasized that an indefinite article "a" or "an" in patent parlance carries the meaning of "one or more" in open-ended claims containing the transitional phrase "comprising." That "a" or "an" can mean "one or more" is best described as a rule, rather than merely as a presumption or even a convention. The exceptions to this rule are extremely limited: a patentee must "evince[ ] a clear intent" to limit "a"

or "an" to "one." This general rule "applies unless 'the language of the claims themselves, the specification, or the prosecution history necessitate[s] a departure from the rule.'"

*SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348, 1360 (Fed. Cir. 2012) (quoting

*Baldwin*, 512 F.3d at 1342–43). *Enfish* further instructs, however, that where the

context of the claims makes clear that the use of "a" is intended to refer to a single

item (here, a signal), then the patentee should be held to that singular

interpretation. 822 F.3d at 1342. Here, that is the case.

First, the claim language itself suggests that the use of "a" and "an" is

intended in the singular throughout claim 1. Claim 1 specifies a transmitter, a

receiver, a signal, a control system, and a bounced signal; there is no question that

the claim specifies just one transmitter, one receiver and one control system.

Consistent with this, it is reasonable to infer that it specifies one signal. The

language relating to the control system specifies a first means, a first speed, a

second means, and a second speed. The language of the claim read, in its entirety

and in context, signifies that the claim invention contemplates one single signal, the

receipt of which by the receiver triggers the first speed, and the non-receipt of which

triggers the second speed. Claim 1 describes two speeds that are predetermined

and set based upon the receipt or non-receipt of a single signal, with speed one

being triggered when that specific signal is received by the receiver, and speed two

being triggered when that specific single signal is not received by the receiver.

Additionally, the claim language, the abstract and the specification all make

clear that the invention is directed to this two speed arrangement, which is dependent upon the receipt or non-receipt of this same bounced signal. The claim language specifies that the bounced signal, which is either received or not received, is the same signal that is transmitted downwardly away from the vehicle via the transmitter that is positioned on the bottom of the vehicle. The abstract confirms this: "[t]he control system sets the speed of the propeller mechanism to a first speed when the receiver receives the bounced signal and the control system sets the speed of the propeller mechanism to a second speed when the receiver does not receive the bounced signal." The bounced signal, that is received to trigger the first speed and not received to trigger the second speed, is necessarily the same single bounced signal. The "summary of the invention" similarly confirms that the bounced signal that triggers the first speed is the same signal that triggers the second speed, as it indicates that the "vehicle will position itself at a predetermined distance away from the object, by toggling between the two speeds when the bounced signal becomes intermittent." U.S. Patent No. 7,100,866 B2 [37-4], Col. 1, lines 60-62. Construing "signal" in this context to mean a single signal is the only way to give meaning to the toggling process contemplated – it is the intermittent presence and absence of that single signal that produces the toggle between the two predefined speeds.

That the covered invention specifies a control system dependent upon the receipt or non-receipt of a single signal is confirmed in the description of the

preferred embodiment:

> In the preferred embodiment, the transmitter transmits an infra-red frequency signal t. The circuit board monitors the receiver's output, in that upon detecting the signal bounced off of a surface the receiver's output is off (referred to as surface detected) and upon not detecting the signal the receiver's output is on (referred to as no surface detected). When the surface is detected for a predetermined time the propelling means is set to the climb speed and when the surface is not detected for a predetermined time the propelling means is set to the fall speed. Moreover, whenever there is a change in the receiver's output (from surface detected to surface not detected or visa versa) the propelling means is set to the hover speed.

'866 patent, Col 4, lines 20-32.

The drawings included in the patent also confirm that the invention contemplates a single signal (and not multiple signals) coming from the transmitter. Figures 3a and 3b show a single signal ("$t_s$") coming from the transmitter. That signal then becomes a bounced signal ("$b_s$") when it bounces off the surface. *See* [37-4], pp. 5, 6. The use of a single label for the signal suggests that only one signal is involved.

Even Rehco's expert, Dr. Matthew Spenko, conceded that construing claim 1 to allow for multiple signals would be problematic. Dr. Spenko testified that, if the control system limitation in claim 1 were construed to allow for "one or more" signals, it would be "confusing" and, in theory, if you had multiple signals and they were received by the receiver, in some instances, they could cause the vehicle to go up and in some instances they could cause the vehicle to go down. DSOF, Exhibit 24, Deposition of Matthew J. Spenko, PH.D., taken 5/4/16 [153-24], p. 86.

For all of these reasons, the Court finds that the invention disclosed in the '866 patent covers a single signal being emitted from the transmitter, and not multiple signals.

Based upon this plain construction, Spin Master's products cannot infringe the '866 patent. Indeed, it is undisputed that Spin Master's accused products all employ multiple signals. Rehco admits that Spin Master's products all use multiple signals. DSOF, ¶70; PSOF, ¶70. According to Rehco, the accused products, including Vectron Wave, Vectron Wave Battle, Atmosphere and all versions of the Flutterbye Fairy, transmit and receive a series of signals. PSOAF, ¶¶22-23, 25-26.

Moreover, even if Rehco were correct that "signal" in claim 1 could be construed to refer to "one or more" signals, the clear language of the claims, the abstract and the specification show that, to the extent multiple signals could be employed in the specified control system, it would be the collective receipt or non-receipt of those signals that would trigger the correlative predefined speed. Rehco's expert, Dr. Matthew Spenko, admitted that the accused products do not explicitly show non-receipt of a signal. Spenko Dep., 125:2-15; PSOF 56. And the '866 patent simply does not disclose a means that sets propeller speeds based upon the simultaneous receipt of some signals and non-receipt of others. Yet that is what Spin Master's products all do.

Spin Master argues that the '866 patent is limited to a specific type of control system – namely, a binary control system. In such a system, Spin Master argues,

"you transmit a signal from the bottom of the vehicle and bounce it off the surface beneath. If the bounced signal is received signaling that the vehicle is low, set the propeller to a predefined speed that causes the vehicle to rise. If the bounced signal is not received signaling that the vehicle is high above the surface, set the propeller to a predefined speed that causes the vehicle to lose altitude." Spin Master's Memorandum in Support of Summary Judgment [152], pp. 12-13. Spin Master represents that a vehicle using a binary control system is always moving up or down because the speeds that are set are predefined to cause one of two results: either the vehicle gains altitude or loses altitude; there is no hovering when using binary control. *Id.*, p. 13. In contrast, Spin Master's accused products use what's called a "proportional control system," which makes nearly constant proportional adjustments to its operating parameters to maintain the vehicle at a specific height. *Id.* Relatedly, Spin Master argues, the accused products never set a predefined speed that causes the vehicle to either gain or lose altitude. As a result, Spin Master argues, its products do not use Rehco's technology and Spin Master does not infringe the '866 patent. *Id.*, p. 15.

To prove infringement, Rehco would have to show that the accused products have "a control system that automatically sets a speed of the propelling means in response to the receiver, said control system having a first means to set the speed of the propelling means to a first speed when the receiver receives **the bounced signal** and the control system having a second means to set the speed of the

40

propelling means to a second speed when the receiver does not receive **the bounced signal**, the first speed being predefined as a speed that causes the vehicle to gain altitude and the second speed being predefined as a speed that causes the vehicle to lose altitude." '866 Patent, Claim 1, Col. 7, line 55-Col. 8, line 6.

Rehco's expert Dr. Spenko testified that, in Spin Master's products, there may be multiple times when a particular signal is not received, and the control system will set different speeds depending upon the particular level identified, based not solely upon that non-receipt, but also upon the receipt or non-receipt of all of the other signals in the series. Spenko Dep., p. 119-120. Spenko admitted that, to the extent the accused products employ "predefined speeds," those speeds are not determined by the receipt or non-receipt of any specific signal – indeed, there will be additional levels in which that signal is received. *Id.*, p. 129. He admitted that the receipt or non-receipt of a single signal does not by itself determine the altitude level; rather, for the accused products, you would need to look at all of the signals to determine the altitude. *Id.*, pp. 130-131. He also admitted at his deposition that, to the extent the accused products can be said to have a first speed and a second speed, it is not clear that the second speed would necessarily cause the vehicle to lose altitude. DSOF, Exhibit 24, Deposition of Matthew J. Spenko, PH.D., taken 5/4/16 [153-24], pp. 101-104. Finally, Dr. Spenko conceded that the '866 patent does not specify any embodiment where the receiver would receive a bounced signal and the speed of the propeller would go down. DSOF, Exhibit 24, Deposition of Matthew

J. Spenko, PH.D., taken 5/4/16 [153-24], pp. 86-87.

Thus, construing claim 1 correctly, in light of its plain language, the abstract, and the specification, Spin Master's products do not infringe claim 1, and Spin Master is entitled to summary judgment of noninfringement. *See PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 734, 740 (Fed. Cir. 2016) ("Under *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1279 (Fed.Cir. 2015), cert. granted, − U.S. −, 136 S.Ct. 890, 193 L.Ed.2d 783 (2016), "the Patent and Trademark Office ("PTO") gives claim language its broadest reasonable interpretation in IPRs"; "[d]istrict courts, by contrast, do not assign terms their broadest reasonable interpretation. Instead, district courts seek out the correct construction—the construction that most accurately delineates the scope of the claimed invention—under the framework laid out in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed.Cir. 2005) (en banc).").

Rehco's second infringement theory posits that, although Spin Master's accused products employ multiple individual signals, in use, the control system of the accused products will set the speed of the propelling means to a speed that causes the products to gain altitude or a speed that causes the products to lose altitude based upon the receipt or non-receipt of a single signal in the series of signals. Rehco's Response [167], p. 19. The record evidence shows otherwise. First, T.W. Wong, an engineer with Spin Master, testified that the accused products set the speed of the propelling means to one of several speeds based upon the receipt or

42

non-receipt of various signals – not a single signal. For example, Wong testified, if the vehicle detects Signals D through G, but not the others, it will recognize that it is at "Level 4." Deposition of T.W. Wong taken 12/6/13 (PSOAF, Exhibit 4 [165-2]),p. 42, lines 14-20. Counsel for Rehco attempted to get Wong to agree that the vehicle knows it is at Level 4 because it did not detect Signal C, a single signal; Mr. Wong resisted, testifying that it is not the presence or absence of a single signal, but rather the information relating to all seven signals, that allows the vehicle to determine its level and decide whether to increase or decrease motor speed. *See Id.*, pp. 42-43. And, as set forth above, Dr. Spenko conceded this point when pressed at his deposition.

For its third infringement theory, Rehco invokes the doctrine of equivalents. While infringement under the doctrine of equivalents is a question of fact, where the evidence is such that "no reasonable jury could determine two elements to be equivalent, district courts are obliged to grant partial or complete summary judgment." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n. 8, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). Furthermore, in order to support a finding of infringement under the doctrine of equivalents, a patentee must "provide particularized testimony and linking argument as to the insubstantiality of the differences" between the claimed invention and the accused device or process, or with respect to the function-way-result test. *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1328 (Fed. Cir. 2007) (quoting *Texas Instruments Inc. v. Cypress*

*Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996)).

To survive summary judgment of noninfringement under the doctrine of equivalents, Rehco must present evidence of equivalence under each prong of the function-way-result test. *Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*, 808 F.3d 1313, 1319-20 (Fed. Cir. 2015) (citing *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1335-36 (Fed. Cir. 2014)). That a claimed invention and an accused device "may perform substantially the same function and may achieve the same result will not make the latter an infringement under the doctrine of equivalents where it performs the function and achieves the result in a substantially different way." *Id.* (quoting *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532 n. 6 (Fed. Cir. 1987)).

Here, Rehco has provided no evidence that Spin Master's accused products perform substantially the same function and achieve the same result as the patented invention. For example, claim 1 discloses, among other things, "a control system that automatically sets a speed of the propelling means in response to the receiver, said control system having a first means to set the speed of the propelling means to a first speed when the receiver receives the bounced signal and the control system having a second means to set the speed of the propelling means to a second speed when the receiver does not receive the bounced signal, the first speed being predefined as a speed that causes the vehicle to gain altitude and the second speed being predefined as a speed that causes the vehicle to lose altitude." This element

specifies a clear-cut two step decision tree: step one asks whether the bounced signal was received. If the answer is "yes," then the first speed is initiated; if the answer is "no," then the second speed is initiated. It is undisputed that the accused products do not operate in this manner. Rather, the accused products include a control system that analyzes numerous signals to determine altitude and then sets one of a series of speeds. To the extent the same result is achieved – i.e., the vehicle hovers – it is achieved in a substantially different way.

Spin Master's engineer T.W. Wong testified that the accused products do not set predefined speeds based upon the receipt or non-receipt of signals. Rather, Wong testified, the receipt and non-receipt of the numerous signals indicate particular altitudes and speed is then set as a function of the given altitude. Deposition of T.W. Wong taken 12/6/13 (PSOAF, Exhibit 4 [165-2]), p. 74, lines 19-24. For example, Wong testified that the processor in the Vectron Wave Battle is programmed to transmit a signal at a predetermined interval; if the processor determines that it needs to increase its altitude, it will increase its motor speed, but the delta increase is not predetermined. *Id.*, p. 76, lines 1-6. Rather, there is a table in the processor that will map to the altitude determined by the Vectron, and in the table, there are predetermined increments for increasing or decreasing the motor speed. That means at different altitudes, the increase or decrease will be different, depending upon the altitude. *Id.*, p. 76, line 23 - p. 77, line 5. This is the same for both Vectron Wave and Vectron Wave Battle. *Id.*, p. 77, line 9. Spin

45

Master's products do not use the signal to determine the speed; they use the signal to determine the altitude level. And Dr. Spenko testified that controlling the altitude of the vehicle does not meet the control system limitation in claim 1. DSOF, Exhibit 24, Deposition of Matthew J. Spenko, PH.D., taken 5/4/16 [153-24], p. 88.

Rehco's argument that a series of signals is the equivalent of a single signal takes Rehco only so far, and fails to demonstrate equivalence on the actual functioning of the control system. Rehco's attempt to establish that the accused products function in substantially the same way as the claimed invention by reference only to the other claim elements does not satisfy its burden on the doctrine of equivalents. *See Advanced Steel Recovery,* 808 F.3d at 1320; *AquaTex Indus.,* 479 F.3d at 1328 ("Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice.").

Essentially Rehco has argued that, because Spin Master's accused products hover, they infringe under the doctrine of equivalents. That reads the '866 patent too broadly. Because the patentee is "required to 'define precisely what his invention is,' . . . it is 'unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citations quoting *White v. Dunbar,* 119 U.S. 47, 52 (1886); *Cont'l Paper Bag Co. v. E. Paper Bag Co.,* 210 U.S. 405, 419, 28 S.Ct. 748, 52 L.Ed. 1122 (1908) ("the claims measure the invention");

*McCarty v. Lehigh Valley R.R. Co.*, 160 U.S. 110, 116 (1895) ("if we once begin to include elements not mentioned in the claim, in order to limit such claim ..., we should never know where to stop"); *Aro Mfg. Co. v. Convertible Top Replacement Co.,* 365 U.S. 336, 339, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961) ("the claims made in the patent are the sole measure of the grant").

Finally, the Court considers Rehco's claim of indirect infringement or inducement. In its complaint, Rehco alleged that Spin Master has indirectly infringed the '866 patent by inducing others to use the accused infringing products. Having determined that Rehco cannot prevail on its claim that the accused products directly infringe the '866 patent, the Court must also find that Rehco's claim of indirect infringement fails.

    2.    Invalidity

Spin Master next argues that Rehco's manipulation and stretching of the asserted claims of the '866 patent to cover Spin Master's products would render at least claim 1 of the '866 patent invalid as anticipated in the prior art. Because Spin Master has asserted invalidity as an affirmative defense and not as a counterclaim, however, the Court need not reach Spin Master's invalidity arguments in light of the determination above that Spin Master is entitled to summary judgment of non-infringment.

**C. Spin Master's Motions to Bar or Limit Witness Testimony**

Spin Master has moved to limit or bar the testimony and opinions of certain

Rehco witnesses – namely, Jeffrey Rehkemper, Mike Hirtle and Matthew Spenko. Spin Master argues that Jeffrey Rehkemper and Mike Hirtle should be precluded from testifying as experts at trial because: (1) Rehkemper is a biased fact witness, not an expert, and is not qualified to offer an expert opinion in the field of contract interpretation or licensing; and (2) Hirtle's opinions violate the four corners rule of contract interpretation and his damages opinion improperly applies an established royalty analysis, rather than a lost profits analysis. Spin Master also seeks to preclude certain opinions of Dr. Matthew Spenko; more specifically, Spin Master asks the Court to strike ¶¶125-134 of Dr. Spenko's opening expert report and to preclude him from testifying on the issues of licensing and patent valuation.

The Court agrees that Jeffrey Rehkemper is not an expert witness. His testimony, however, played no role in the Court's decision today, and the motion to preclude his testimony is denied as moot. Additionally, for the reasons explained above, the Court rejected Spin Master's arguments and considered the testimony of Mike Hirtle and Matthew Spenko in deciding Spin Master's motion for summary judgment and, to that extent, Spin Master's motions to preclude the testimony of these witnesses are denied.

## Conclusion

For the reasons explained above, Spin Master's motion for summary judgment [151], [152] is granted in part and denied in part. The motion is granted as to Rehco's claim for breach of the Helicopter Agreement (Count I); granted as to

Rehco's claim for breach of the Airplane Agreement (Count III) as to the Osprey and the Dominator; and denied as to Rehco's claim for breach of the Airplane Agreement as to the Jet Set, A-10 Warthog and Hawk Eye Blue Sky products. Spin Master's motion for summary judgment of noninfringment of the '866 patent (Count II) is granted, and its motion for summary judgment on invalidity is denied as moot. Spin Master's motion to preclude Jeffrey Rehkemper and Mike Hirtle from testifying as expert witnesses [145], [147] and Spin Master's motion to bar certain opinions of Matthew Spenko [148], [150], are denied as moot.

Date: March 22, 2017

ENTERED:

John Robert Blakey
United States District Judge