## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

REHCO LLC,

      Plaintiff,

      v.

SPIN MASTER LTD.,

      Defendant.

Case No. 13-cv-2245

Judge John Robert Blakey

## <u>MEMORANDUM OPINION AND ORDER</u>

This case is before the Court on the parties' post-trial motions [298], [299], [300], filed in the wake of a December 19, 2019 jury verdict. Plaintiff Rehco LLC moves for entry of judgment under Rule 54(b) [298], and Defendant Spin Master Ltd. moves for judgment as a matter of law [299] and, alternatively, for a new trial [300]. For the reasons explained below, the Court finds that the jury's verdict on Rehco's patent infringement claim stands, but the verdict on Rehco's breach of contract claim cannot stand. The Court further finds that it requires additional information before it can enter judgment on the patent infringement claim. Accordingly, the Court denies in part Rehco's motion and reserves ruling in part; grants in part Spin Master's motion for a new trial [300]; and denies Spin Master's motion for judgment as a matter of law [299].

## I. __Background & Procedural History__[1]

On December 19, 2019, a jury determined that Defendant Spin Master breached the Helicopter Agreement it executed with Plaintiff Rehco by failing to pay Rehco royalties on the Havoc Heli toy helicopter product, and also infringed U.S. Patent No. 7,100,866 (the '866 patent) in connection with Spin Master's sales of its Vectron Wave, Atmosphere, and Flutterbye Fairy products. The jury awarded Rehco damages in the amount of $4,085,899.20 on Rehco's contract claim and $5,385,843.70 on the infringement claim. It rejected Spin Master's defenses and determined that Spin Master's patent infringement was willful.

Following the verdict, Rehco moved for entry of judgment under Rule 54(b) [298], seeking: enhanced damages for willfulness; an ongoing royalty for both the adjudicated infringing products and "colorable variations" of those products; pre- and post-judgment interest; attorneys' fees based upon a finding that this is an "exceptional case"; and an order designating Rehco as a prevailing party entitled to taxable costs. *See id.*

For its part, Spin Master moved for judgment as a matter of law [299], arguing that the jury's verdict was not supported by substantial evidence. On the contract claim, Spin Master argued that Rehco failed to offer evidence to support the verdict that the Havoc fell within the parties' Helicopter Agreement. *Id.* at 2. On the infringement claim, Spin Master moved for renewed judgment as a matter of law on infringement, damages, and willfulness. *Id.* at 1.

---

[1] Rather than recount the full history and factual background of this case, the Court will assume familiarity with its prior decisions.

Alternatively, Spin Master sought a new trial under Rule 59 on the issues of infringement, damages, and breach of contract. *See* [300]. Spin Master argued that the overwhelming weight of the evidence admitted at trial demonstrated that Spin Master's products did not infringe the '866 patent; that the introduction and admission of evidence of Spin Master's revenues for sales of the accused products and Rehco's license agreements was improper and contrary to Federal Circuit authority, as well as highly prejudicial; and that the overwhelming and clear weight of evidence relating to Rehco's breach of contract claim also ran contrary to the jury's verdict on this claim. *Id.* at 1.

After filing their post-trial motions, the parties attempted to resolve their remaining disputes informally and then with Court assistance. On August 24, 2020, the Court held a settlement conference, but the parties reached an impasse on all issues and asked the Court to rule on the pending post-trial motions. The Court does so below.

## II. **Legal Standards**

Rehco seeks entry of judgment under Federal Rule of Civil Procedure 54(b), which provides that when

> an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Spin Master moved for a directed verdict at the close of Rehco's case and now renews its Rule 50 motion, seeking judgment notwithstanding the verdict. Alternatively, Spin Master moves for a new trial under Rule 59(a).

The law of the Seventh Circuit controls the standard for Rule 50 motions (and thus Rule 59) because such motions "involve procedural issues not unique to patent law." *Black & Decker Inc. v. Robert Bosch Tool Corp.*, 476 F. Supp. 2d 887, 891 (N.D. Ill. 2007) (citing *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1324 (Fed. Cir. 2005)).

When ruling on a Rule 50 motion following a jury verdict, the Court does not re-weigh the evidence presented at trial or make credibility determinations. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); Fed. R. Civ. P. 50(b). Instead, the Court asks "whether the jury had 'a legally sufficient evidentiary basis' for its verdict." *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, No. 19-1528, 2020 WL 6813872, at *6 (7th Cir. Aug. 20, 2020) (quoting *May v. Chrysler Grp., LLC*, 716 F.3d 963, 971 (7th Cir. 2013)). In doing so, the Court construes "all evidence in the record—and inferences that can be reasonably drawn from that evidence—in favor of the party that prevailed at trial on the issue"—here, Rehco. *Id.* This is a "high burden for the moving party to satisfy" and this Court will overturn a verdict "only if no rational jury could have found in [Rehco's] favor." *Id.* (quoting *Andy Mohr Truck Ctr., Inc. v. Volvo Trucks N. Am.*, 869 F.3d 598, 602 (7th Cir. 2017)).

A motion for a new trial under Rule 59 may be granted only "when the district court—in its own assessment of the evidence presented—believes that the verdict

4

went against [its] manifest weight." *Abellan v. Lavelo Prop. Mgmt., LLC*, 948 F.3d 820, 831 (7th Cir. 2020) (citing *Mejia v. Cook County*, 650 F.3d 631, 634 (7th Cir. 2011)). In contrast to Rule 50, Rule 59(a) grants the trial court the "special power" to get a "general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts." *Id.*

### III.   Discussion & Analysis

Rehco seeks judgment on its breach of contract claim and its infringement claim; it also seeks enhanced damages, attorneys' fees, interest, costs, and royalties on products other than those tried to the jury. *See* [298]. Spin Master seeks to overturn the jury's verdict on both the breach of contract and infringement claims, seeking judgment notwithstanding the verdict or, alternatively, a new trial, on both claims. *See* [299], [300]. Spin Master also disputes Rehco's entitlement to enhanced damages, fees, and additional royalties, and it disputes, in part, Rehco's requests for interest and costs. *See* [299], [300]. Alternatively, Spin Master argues that it is entitled to a new trial because the jury's verdict on both of Rehco's claims ran contrary to the overwhelming and clear weight of the evidence and because Rehco introduced improper and highly prejudicial evidence on damages. *See* [300]. This Court addresses each claim in turn below.

### A.   Post-Trial Arguments on Rehco's Breach of Contract Claim

The jury found for Rehco on its breach of contract claim and awarded damages in the amount of $4,085,899.20. [286] at 2, 4. Rehco seeks a final judgment.

Spin Master, on the other hand, argues that the trial evidence does not support the jury's findings on this claim. [299] at 23–28. Specifically, Spin Master argues that Rehco failed to offer evidence to show either that the Havoc constituted an "Item" as that term was defined in the parties' agreement, or that it constituted an improvement, modification, enhancement, or derivation of any Item. *Id.* at 24–25. As a result, Spin Master argues, the jury's verdict on the breach of contract claim not only lacks an evidentiary basis, but it also conflicts with the plain language of the agreement and, per Spin Master, produces an absurd result in which any toy helicopter would fall within the scope of the parties' agreement. *Id.* at 26.

In response, Rehco argues that the jury considered both the relevant language from the Helicopter Agreement and the physical exhibit of the Havoc Heli, which were both admitted into evidence without objection. [302] at 28. Combined with the entire record (including Jeff Rehkemper's testimony), the trial evidence suffices, Rehco argues, to support the jury's verdict on the breach of contract claim which remains consistent with the parties' written agreement. *Id.*

### 1. <u>Contractual Language</u>

Here, the parties' contract included specific Item descriptions, all of which were presented to the jury. The Helicopter Agreement defined the "Item" (identified as a "Radio-Controlled Helicopter") as follows:

> A motorized helicopter toy having a launching base whereby the launching base may function both to charge the batteries in the helicopter and to energize the propeller to sufficient RPM's required for launch. The launching base has batteries and a timer circuit for charging the helicopter and may have a motor for energizing the propeller. The helicopter consists of an airframe, the motorized means for spinning the

propeller, the means for protecting the ends of said spinning propeller, and the means for correcting counter-rotation and pitch variations. The helicopter may have several forms of control, starting with no control or 'free flight,' or it may be outfitted with electronics having a microprocessor for 'preprogrammed' or 'programmable' flight or it may be outfitted with a radio receiver for use with a hand held remote transmitter or it may be any combination of the above. The helicopter may or may not take the form of 'traditional' helicopter styling and the technology used to make the item fly could be used in other flying toys that are unidentified at this point.

Agreed Exhibit 1, ¶1.a.

Later in September 2004, the parties executed a First Amendment to the Helicopter Agreement, Agreed Exhibit 2, which added the "RC Pro Helicopter" and the "RC Mini Helicopter" to the Item description. In the First Amendment, the parties deleted the Item description from the initial agreement and replaced it with the following:

1.a.i. The 'Radio-Controlled Helicopter,' described as a radio controlled rechargeable motorized toy helicopter having a single motor for driving both an approximately 14" main rotor and a small geared tail rotor. The main rotor is used for lift and features unique patented safety guards (in front of the rotor blades) as well as stabilizing means in the form of patented offset pivots and counterweights. The tail rotor is used to both offset counter rotation and point the helicopter. The RF electronics feature proportional control for the speed of the motor and the helicopter comes with a base having the means for recharging the batteries on board the helicopter.

1.a.ii. A second item, the 'RC Pro Helicopter,' described as a radio controlled rechargeable motorized toy helicopter having a single motor for driving both an approximately 16 ½" main rotor and a small geared tail rotor. The main rotor is used for lift and features unique patented safety guards (in front of the rotor blades) as well as stabilizing means in the form of patented offset pivots and counterweights. The tail rotor is used to offset counter rotation. The chassis includes two servos for lifting the main rotor forward, backward, left and right for steering the helicopter.

7

The RF electronics feature proportional control for the speed of the motor and pulsed inputs to servos for easier steering control capability. The helicopter comes with a base having the means for recharging the batters on board the helicopter.

1.a.iii. A third item, the 'RC Mini Helicopter,' described as a radio controlled rechargeable motorized toy helicopter having two approximately 9" main rotors stacked vertically and where each rotor is individually powered by a single motor and where the tail rotor has been replaced with a large vertical fin for rotational stability. The main rotors are used for lift and feature unique patented safety guards (in front of the rotor blades) as well as stabilizing means in the form of patented offset pivots and counterweights. When the two main rotors are powered at different speeds, they will point the helicopter either right or left. The chassis includes one servo for tilting the lower rotor causing the helicopter to move forward or backward. The RF electronics feature proportional control for the speed of the motors and pulsed inputs to the servo for easier steering control and also may or may not include an electronic gyro. The helicopter comes with a base having the means for recharging the batters on board the helicopter.

Agreed Exhibit 2, ¶1.

The parties also executed a Second Amendment to the Helicopter Agreement, which added a fourth item, the "Tethered Helicopter," which was described as: "a remote-controlled motorized toy helicopter having two four bladed rotors with safety rings and stacked vertically. One motor powers both rotors. A power source is tethered to the helicopter from a controller via a wire." Agreed Exhibit 3, ¶1.a.iv.

Lastly, the Helicopter Agreement also required Spin Master to pay royalties on products beyond the specifically-defined Items, because the parties' agreement included coverage for modifications. In the words of the contract, the Agreement applied to such "modifications" of the Item as follows:

Any improvement, modification, enhancement or derivation of the Item

8

during the term of the License granted by this Agreement, regardless of how or by whom such improvement, modification, enhancement or derivation is made, will be deemed to be included within the scope of the rights, obligations and reversion provisions of this Agreement, except for Rehco's representations and warranties.

Agreed Exhibit 1, ¶1.c.

## 2.    Evidence that Havoc Constituted An "Item"

At trial, no one testified that the Havoc's design fell directly within the original or amended "Item" description, and Rehco introduced no evidence to show that it did so. For example, no one testified that the Havoc employed a remote control or tether, or that the toy otherwise factually fit within any of the other Item descriptions. On the contrary, the physical evidence (a sample of the Havoc) demonstrated that the Havoc lacked either a tether or remote control.

Likewise, as to the qualities of the Havoc itself, Rehco called Ben Dermer as an adverse witness, but his testimony undermined the notion that the Havoc was, in fact, a "Radio-Controlled Helicopter" Item as designed. At trial, Dermer testified that the Sky Patrol (which the jury also saw, *see* Agreed Exhibit 5) was the original helicopter "Item" described. [291] at 28. He also testified that the Havoc lacked features contained within the Item descriptions, because it did not have "servos" and it used two motors and an IR control system (not an RC control system), and had four-directional control. *Id.* at 114–115.

Beyond this witness, Rehco tried unsuccessfully to offer lay opinion testimony from Steve Rehkemper about whether he believed royalties were owed to him on the Havoc. [292] at 103. Obviously, the Federal Rules of Evidence prohibit opinion

9

testimony concerning legal questions, so Spin Master objected under Rule 701. *See United States v. Noel*, 581 F.3d 490, 496 (7th Cir. 2009) (observing that "lay testimony offering a legal conclusion is inadmissible because it is not helpful to the jury, as required by Rule 701(b)"); *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (noting that expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible) (citing *United States v. Sinclair*, 74 F.3d 753, 757 n.1 (7th Cir. 1996)). At sidebar, this Court inquired whether Rehco had a proper factual question for the witness, and learned that Rehco had none, other than its plan to elicit Rehkemper's conclusory opinion that the Havoc fell within the legal definitions of the contract, thus triggering a right to royalties. [292] at 104.[2] Given the nature of Rehco's question and counsel's proffer at sidebar, this Court's properly exercised its discretion in sustaining the objection—especially where, as here, counsel failed to proffer any factual testimony about the qualities of the Havoc itself, which could properly lay an evidentiary foundation (based upon personal knowledge or an otherwise admissible lay opinion) that the Havoc was, in fact, a "Radio-Controlled Helicopter" Item as designed.

Ultimately, Rehco failed at trial to submit any admissible, factual testimony to establish that the Havoc's design constituted an "Item" as that term was understood by the parties.

---

[2] As to this witness, because Rehco neither disclosed nor offered him as an expert witness under Rule 702, Rehco needed to justify the opinion testimony under Rule 701. Rehco failed to do so. [292] at 104 (Court: "What's the purpose of the question? . . . That's why he is in the courtroom so I'm trying to figure out what the factual question is. [Counsel for Rehco]: That's all he was going to say. He believes it's covered. He is not going to get into it . . .").

### 3.    **Evidence that Havoc Constituted A "Modification"**

As noted above, the Helicopter Agreement included royalty coverage for any "modification" of the Item, Agreed Exhibit 1, ¶1.c. Since the parties' contract does not define the key terms ("improvement, modification, enhancement or derivation") and since neither party requested a jury instruction to legally explain this phrase further, the plain language of the contract controls this alternate path for Rehco.

Under this theory, Rehco offered some evidence at trial to show that the Havoc, in fact, constituted an "improvement" or "modification" (as those terms are commonly understood) of the original helicopter "Item" described. Specifically, Jeff Rehkemper testified that the Havoc was an "improvement" on the Sky Patrol product (i.e., an "Item"). He stated that, when inventing a new product, inventors always start with what exists in the marketplace, and that here, the Havoc has a stacked rotor configuration with a pivotal connection between the propeller and the drive shaft, where the leading edge of the rotor is above the pivot point. [292] at 41–45. As a factual matter, therefore, he testified that the Havoc's rotor constitutes a "modification" or a general improvement of what is used in the Sky Patrol. *Id.* at 66–67. Additionally, Steve Rehkemper opined, without objection, that the Havoc's inventor, Alexander Van de Rostyne, must have learned something from the Rehkempers' inventions (including the Sky Patrol), because he cited their patents as prior art in his patent for the Havoc. *Id.* at 105–06.

This evidence, however, stands in stark contrast to other portions of the trial record. For example, Ben Dermer provided direct factual testimony that Rehco

11

"never provided Spin Master with anything anywhere close to the Havoc." [291] at 131.[3] Likewise, undisputed evidence (relating to Rehco's termination of the Helicopter Agreement and the Havoc sales figures) undermined any notion that the parties understood the Havoc's design to constitute a "modification" of an Item. Namely, the evidence showed that Rehco terminated the Helicopter Agreement because of low sales; Steve Rehkemper himself testified to this fact on the witness stand, [292] at 110, and the jury heard no other evidence suggesting any other reason for Rehco's termination of the contract. Yet the evidence also unequivocally showed that Havoc sales were not low—far from it—when Rehco terminated the contract for low sales. Specifically, Ben Dermer testified that gross revenues off the Havoc earned around $72 million. [291] at 132. The parties' exhibits solidified the point: Agreed Exhibits 16 and 17 showed that Rehco terminated the Helicopter Agreement effective August 22, 2008 for low sales; and Plaintiff's Exhibit 214, a summary of Havoc sales, shows that Spin Master's net sales from the Havoc totaled $40,748,890 in 2007 and

---

[3] Spin Master also tried, unsuccessfully, to elicit opinion testimony from Ben Dermer on why he believed the Havoc did *not* fall within the modifications clause of the contract (thus contradicting Rehco's later failed attempt to elicit Steve Rehkemper's lay opinions). *See* [291] at 120–24. Here, the line of questions initially went into evidence without objection. *Id.* at 120 ("[Counsel for Spin Master]: All right. And I put up for the jury the modifications clause of Exhibit 1. It's provision 1.c. You were asked all sort of questions regarding this modifications clause. Did Spin Master believe that the Havoc Heli falls within the modifications clause? [Mr. Dermer] Absolutely not. [Counsel for Spin Master] Why not? [Mr. Dermer] For a bunch of reasons . . ."). Later, after an extended explanation, Rehco finally objected given the absence of any expert disclosure under Rule 702. Since the witness had not been offered as an expert, this Court inquired at sidebar as to the factual purpose of the line of questioning, but counsel failed to offer a valid evidentiary basis. *Id.* at 120–24. Based upon the record, this Court properly sustained the objection to the specific question asked, because, as a lay witness, Mr. Dermer possessed no admissible lay opinion or personal knowledge of the facts regarding the drafting or negotiation of the parties' agreement. *Id.* at 123 ("The Court: The question you asked was what? . . . [Counsel for Spin Master]: I think I said why does Spin Master believe that the Sky – that the Havoc Heli does not fall within the modifications clause. * * * The Court: Did he participate in the drafting of this? [Counsel for Spin Master]: He did not."). After sustaining the objection, this Court granted Rehco's request for a jury instruction to disregard the beginning of Mr. Dermer's answer. *Id.* at 124.

$26,281,574 in 2008.

### 4. **The Sufficiency of the Evidence**

Under Rule 50, the Rehkempers' testimony that the Havoc constituted a modification or derivation of the Sky Patrol could support a finding that the Havoc fell within the contractual improvement or modification clause, thus triggering the Helicopter Agreement's royalty obligation. As a result, even though the record contains contrary evidence, the admission of the Rehkempers' testimony on this point precludes the entry of judgment as a matter of law in favor of Spin Master on the breach of contract claim.

Under Rule 59, however, Rehco's testimony about an improvement on the Sky Patrol (without more) cannot overcome the common-sense, circumstantial evidence to the contrary in the record. Beyond Ben Dermer's unimpeached testimony that Rehco "never provided Spin Master with anything anywhere close to the Havoc," [291] at 131, it is impossible to square the parties' stipulated sales figures with any claim of low sales, and impossible to square Rehco's own admission that it terminated the Helicopter Agreement for low sales with its claim that this same Agreement covered the Havoc. As such, the jury's verdict that Spin Master owed royalties on the Havoc goes against the manifest weight of the evidence, and relief under Rule 59 is appropriate. *See Mejia*, 650 F.3d at 634 ("A motion for a new trial can be granted when the district court—in its own assessment of the evidence presented—believes that the verdict went against the manifest weight. On the other hand, a motion for a judgment as a matter of law can be granted only if the court—after viewing the

evidence in the light most favorable to the non-movant—believes that the evidence supports but one conclusion—the conclusion not drawn by the jury. The standards applied to these two motions differ significantly, so much so that a motion for a new trial may be granted even if a motion for judgment as a matter of law must be denied.") (citations and internal quotation marks omitted). *See also* 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2806 (3d ed. 2002) ("On a motion for a new trial—unlike a motion for a judgment as a matter of law—the judge may set aside the verdict even though there is substantial evidence to support it. The judge is not required to take that view of the evidence most favorable to the verdict-winner."). The Court grants Spin Master's Rule 59 motion as to Rehco's breach of contract claim.

### B. Post-Trial Issues Relating to Rehco's Infringement Claim

On Rehco's infringement claim, the jury determined that Rehco established every requirement of claims 1, 2, and 3 of the '866 patent, either literally or under the doctrine of equivalents, in the Vectron Wave, the Atmosphere, and the Flutterbye Fairy. [286] at 5. Consistent with that verdict, Rehco seeks judgment on this claim and also seeks enhanced damages (based upon the jury's finding of willfulness) and fees (based upon a finding that this case is "exceptional").

In turn, Spin Master argues that the evidence fails to support the jury's findings on Rehco's patent infringement claim; in particular, Spin Master challenges the jury's findings on infringement, on damages, and on willfulness. Spin Master

asks the Court to reject Rehco's request for enhanced damages and an exceptional case finding (with its associated award of fees).

### 1.      Sufficiency of Evidence Relating to Infringement

Hoping to undermine a judgment on the jury's verdict in favor of Rehco on the infringement claim, Spin Master argues that the jury's infringement findings are not supported by substantial evidence. [299] at 8–13. Not so.

Rehco presented ample evidence to support its claim at trial. Rehco's expert, Dr. Spenko, testified that each accused product contains each limitation in the patent, as construed by the Court. [289] at 86–107, 111–30 (testimony accompanying the marking off of elements on Agreed Exhibit 23 as to the Vectron Wave for claims 1, 2, and 3); *id.* at 137–55, [290] at 8–16 (same for Atmosphere); *id.* at 21–41 (same for Flutterbye Fairy). Moreover, when Rehco moved to qualify Dr. Spenko as a Rule 702 expert in the field of robotics and control systems, Spin Master did not object; and thus, this Court and ultimately the jury accepted his testimony as such. [289] at 78 (robotics), 79–80 (control systems).

In response to this evidence, Spin Master argues that Dr. Spenko's opinions lack weight because they were based solely upon playing with the product. Again, not so. At trial, Spenko testified that, although he did play with the accused products, he also based his opinions upon Spin Master employee T.W. Wong's testimony and product literature, including the instruction manual for the Vectron Wave, a promotional video, a physical inspection of the products, and the programming flowchart for the Vectron Wave, then known as the "UFO," and the Flutterbye Fairy.

Although Spin Master attempted to distinguish its control system from the system covered in the patent by showing that its products did not purportedly "predefine" speeds, Dr. Spenko testified that controlling the PWM signal is the same as controlling the motor speed, [289] at 86; he testified that increasing PWM percentage increases the rotor speed, and conversely, decreasing the PWM percentage decreases the rotor speed, *id.*; and he testified that changes in PWM correspond to changes in motor speed, *id.* To be sure, Spin Master presented contrary evidence, but the jury was free to accept or reject aspects of the evidence and to credit the testimony it found most credible.[4]

In short, substantial evidence supports the jury's infringement finding and the Court cannot say that this finding ran contrary to the manifest weight of the evidence. Accordingly, the Court will not disturb the jury's verdict on infringement.

### 2.   The Jury's Infringement Damages Award

Spin Master next argues that the jury's damages award is not supported by the weight of the evidence, and that Rehco's damages presentation ran contrary to Federal Circuit precedent.  Spin Master argues that the law required Rehco to apportion damages in a specific manner, and it failed to do so.  As a result, Spin

---

[4] For example, Spin Master's Edwin Steele disagreed with Dr. Spenko's expert findings. [293] at 172. Spin Master also cross-examined Dr. Spenko on the differences between PWM and motor speed and the deficiencies in the methods he used to find equivalence and infringement. [290] at 64–99. And Spin Master's own expert, Dr. Jason Janet (offered without objection under Rule 702 as an expert in the fields of control systems in flying vehicles, robotics, and source code), testified that just because a vehicle hovers does not tell you how it is programmed, and to know that you would need to see the source code, which Spenko did not do. [293] at 42. Ostensibly, Rehco's own Jack Peach also agreed with Dr. Janet on the value of seeing source code, saying in an email that it seemed like the Vectron Wave operated like Rehco's auto hover toy, but he needed to see the software. [292] at 64.

16

Master claims, the jury became confused and awarded inflated damages that go well beyond the patented invention. The Court disagrees: Rehco properly proved and apportioned its damages.

When an accused product is found to infringe, the patentee is automatically entitled to damages. Upon a finding of infringement, 35 U.S.C. § 284 provides that the Court "*shall* award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." (emphasis added). Although the law automatically entitles a prevailing patentee to damages, such patent owner still bears the "burden of proving the amount of damages adequate to compensate it" for defendant's infringement. *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1029 (Fed. Cir. 1996). Moreover, this burden "remains with the patentee," and defendant is not required to produce any evidence to rebut the patentee's damages theory. *Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*, 909 F.3d 398, 411 n.1 (Fed. Cir. 2018), *cert. denied sub nom. Enplas Display Device Corp. v. Seoul Semiconductor Co.*, No. 18-1530, 2019 WL 5686459 (U.S. Nov. 4, 2019).

In general, two categories of compensation exist for infringement: "the patentee's lost profits and the 'reasonable royalty he would have received through arms-length bargaining.'" *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1309 (Fed. Cir. 2018) (quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009)). Here, Rehco never sought lost profits; instead, it sought a reasonable royalty, which seeks to compensate the patentee "for its lost opportunity

to obtain a reasonable royalty that the infringer would have been willing to pay if it had been barred from infringing." *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334 (Fed. Cir. 2015) (citing *Lucent Techs.*, 580 F.3d at 1325).

Likewise, a patentee is only entitled to a "reasonable royalty attributable to the infringing features"; and thus, the patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018) (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)), *cert. denied*, 139 S. Ct. 1265 (2019). In accordance with *Garretson*, the Federal Circuit has "required that royalties be apportioned between the infringing and non-infringing features of the product." *Id.* (citing *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226–27 (Fed. Cir. 2014); *VirnetX, Inc. v. Cisco Systems*, 767 F.3d 1308, 1326 (Fed. Cir. 2014); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011); *Lucent Techs.*, 580 F.3d at 1336–37). When the accused technology does not make up the whole of the accused product, the patentee must "apportion the [infringer]'s profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative." *Finjan*, 879 F.3d at 1309–10 (quoting *Garretson*, 111 U.S. at 121). As such, undertaking an "apportionment analysis where reasonable royalties are sought generally requires a determination of the royalty base to which the royalty rate will be applied." *Power Integrations*, 904 F.3d at 977. Where "multi-component products are accused of

18

infringement, the royalty base should not be larger than the smallest salable unit embodying the patented invention." *Id.*

When this issue came up at trial, Rehco argued that the accused products themselves constituted the smallest salable units and that the appropriate royalty base was the sales price of the entire vehicle (the cost of the Vectron, Atmosphere, or Fairy). At trial, the parties did not dispute the various sales figures for these products, which all came into evidence by agreement.

But even when a damages theory relies on the smallest salable unit as the basis for calculating the royalty, the patentee must usually "estimate what portion of that smallest salable unit is attributable to the patented technology when the smallest salable unit itself contains several non-infringing features." *VirnetX*, 767 F.3d at 1327. The key exception to this principle is the "entire market value rule" which allows for the "recovery of damages based on the value of an entire apparatus containing several features, when the feature patented constitutes the basis for consumer demand." *Lucent*, 580 F.3d at 1336; *see also Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995) (en banc). Essentially, the law requires patentees to "apportion the royalty down to a reasonable estimate of the value of its claimed technology," unless it can "establish that its patented technology drove demand for the entire product." *VirnetX*, 767 F.3d at 1329. Such "strict requirements limiting the entire market value exception ensure that a reasonable royalty 'does not overreach and encompass components not covered by the patent.'" *Id.* at 1326 (quoting *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 70 (Fed. Cir.

2012)). Thus, if the product has other valuable features that also contribute to driving consumer demand—patented or unpatented—then the damages for patent infringement must be apportioned to reflect only the value of the patented feature. *See AstraZeneca*, 782 F.3d at 1338–40.

Following this precedent, Rehco cited *Exmark Manufacturing. Co. Inc. v. Briggs & Stratton Power Products Group, LLC*, in support of the damages award. In *Exmark*, the Federal Circuit upheld the use of the entire product (a lawn mower) as the royalty base, noting that the use of the entire product was "particularly appropriate" because the asserted claim was, in fact, "directed to the lawn mower as a whole." 879 F.3d 1332, 1348–49 (Fed. Cir. 2018). As *Exmark* emphasized, "apportionment can be addressed in a variety of ways, including 'by careful selection of the royalty base to reflect the value added by the patented feature" or "by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof.'" *Exmark*, 879 F.3d at 1348 (quoting *Ericsson*, 773 F.3d at 1226). So long as the patentee "adequately and reliably apportions between the improved and conventional features of the accused [product], using the accused [product] as a royalty base and apportioning through the royalty rate is an acceptable methodology." *Id.* (citing *Garretson*, 111 U.S. at 121). The "essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Id.* As such, the Federal Circuit upheld use of the entire mower as the royalty base, but required the patentee to apportion using the royalty *rate*: "such apportionment can be done in

20

this case through a thorough and reliable analysis to apportion the royalty rate [and] one possible way to do this is through a proper analysis of the *Georgia–Pacific* factors." *Id.* (citing *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970)). As the court explained, "the standard Georgia–Pacific reasonable royalty analysis takes account of the importance of the inventive contribution in determining the royalty rate that would have emerged from the hypothetical negotiation." *Id.*

In support of the damages award, Rehco argued that this case presented an analogous situation to *Exmark*. The language of the claims here support that position: claim 1 covers "a vehicle" (the entire product) just as the claim at issue in *Exmark* claimed a lawn mower (the entire product). And Rehco's expert, Dr. Spenko, testified that the patented invention constituted the entire vehicle, not just the control system. [289] at 131–32. Consistent with *Lucent*, Rehco also introduced ample evidence that the control system drove consumer demand for the product. For example, Dr. Spenko testified that the Vectron Wave exhibited a revolutionary play pattern and that the product was hot because it hovered over the user's hand and did not require a remote controller. *Id.* at 130–32. Dr. Spenko testified that "there's a clear connection and nexus between the commercial success of the Vectron Wave and the inventions that are in Claims 1, 2, and 3 of the '866 Patent." *Id.* at 135. He said the same about the Atmosphere, [290] at 19–20, and the Flutterbye Fairy, *id.* at 42–44. This evidence supports Rehco's argument that the appropriate royalty base is the product unit. Even though Spin Master presented its own facts about product

21

demand, the jury was free to weigh any credibility conflicts and decide facts about such demand for itself.[5]

Following *Exmark*, Rehco also offered apportionment evidence as to the royalty rate (rather than royalty base) under the entire market value exception. For example, at trial, Rehco offered testimony from Steve Rehkemper concerning what royalty rate Rehco obtained from comparable licensees with respect to other products incorporating the same '866 control system. Rehco introduced a November 2015 agreement executed with Five Below, which gave Rehco a royalty of 5% on gross sales of the licensed product; a December 2016 agreement executed with MerchSource for a toy satellite, which gave Rehco a royalty of 5% of the net wholesale selling price of the licensed product; a September 2019 agreement executed with Kaliber Global for an object sensing drone, which gave Rehco a royalty of $1 on every unit sold; and a July 2019 agreement executed with Funtime Gifts for a flying bumblebee, which gave Rehco a royalty of 5% of the wholesale selling price or $.25 per unit sold, whichever was greater. *See* [292] at 118–27. Rehco also offered evidence concerning the royalty Spin Master was willing to pay Toytec for the technology used specifically in the accused products here. The jury heard that Spin Master gave Toytec a 3% royalty on sales for its control system. [291] at 59. All of this goes to apportionment of the royalty rate, and through such testimony and exhibits, Rehco provided the requisite "basis in fact to associate the royalty rates used in prior licenses to the particular

---

[5] For example, Spin Master relied upon the testimony of Ben Dermer who testified that the Vectron, the Vectron Wave's predecessor, used a different control system (a remote-control system) and yet the Vectron was also a huge seller and critically acclaimed in the toy industry.

hypothetical negotiation at issue in the case." *Uniloc*, 632 F.3d at 1317 (patentee may not rely on unrelated licenses to increase the reasonable royalty rate above rates more closely linked to the economic demand for the claimed technology) (citing *ResQNet.com, Inc. v. Lansa, Inc.,* 594 F.3d 860, 869 (Fed. Cir. 2010)).

Given the entire trial record, Rehco produced (and the jury accepted) these relevant licenses in determining a reasonable royalty rate and apportioned damages, because the licenses were "commensurate with what the defendant has appropriated." *ResQNet.com* at 872.[6] At trial, Rehco asked the jury to award a royalty of 5% on Spin Master's gross sales of the three infringing products (it requested, in other words, a royalty base equal to the gross per unit sales price and a royalty rate of 5%), which it argued remained consistent with what other licensees were willing to pay. Rehco then offered the parties' financial stipulation, Exhibit 215, which showed that Spin Master's gross revenues on the three accused products totaled $107,716,874. The jury awarded infringement damages of $5,385,843.70, which is 5% of the total gross revenue number on Exhibit 215. In other words, the jury gave Rehco the exact allocated sum that it had requested, and this award finds support in the Five Below and Funtime Gifts licenses, Steve Rehkemper's testimony, and the parties' financial stipulations. Such evidence constitutes competent evidence specifically outlined in *Georgia-Pacific Corp.*

Lastly, to the extent Spin Master challenges the damages award because Rehco did not support it with expert testimony, the request is denied. Even though Rehco,

---

[6] Once again, Spin Master offered its own version of the facts regarding comparability at trial, but the jury remained free to reject it, and did so with its verdict. *See* [292] at 136–42.

as the patent holder, must carry the burden of proving damages by a preponderance of the evidence, nothing requires Rehco to meet this burden using expert testimony. Although expert testimony is typically offered to support a damages theory or claim, such testimony is not *required*. The patent damages statute provides that the Court "*may* receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances." 35 U.S.C. § 284 (emphasis added).

Based upon the proper evidence of damages and apportionment, the Court declines to disturb the jury's infringement damages award.

### 3.    Rehco's Request for Royalties on Other Products

At trial, Rehco offered evidence to show that three of Spin Master's products (the Vectron Wave, Atmosphere, and Flutterbye Fairy) infringed each and every element of claims 1, 2, and 3 of the '866 patent. Rehco also offered evidence of Spin Master's sales of these products and asked the jury to award a 5% royalty on those sales. The jury accepted Rehco's evidence and awarded damages on the basis Rehco urged.

In its post-trial motion, Rehco now asks the Court to award a similar 5% royalty on other products Spin Master makes and sells. *See* [298] at 21–22. The Court rejects this request, because Rehco fails to provide any evidentiary basis to award royalties on products not proven to infringe Rehco's patent. A patent gives the patent holder the right to sue for infringement and collect a royalty as damages; but the Court has no basis to award damages or royalties absent an evidentiary finding

of infringement—which does not exist here as to products other than the three accused products on which Rehco sued.

Rehco argues in its post-trial motion that Spin Master is just repackaging the accused products as new products. Spin Master disagrees and claims that its new products use the Vectron Wave Battle control system, specifically designed around the alleged infringement. In fact, Rehco dropped its claim as to the Vectron Wave Battle on the eve of trial and proceeded on just the Vectron Wave, Atmosphere, and Flutterbye Fairy products. As a result of Rehco's own legitimate trial strategy, this Court has no basis to find that the Vectron Wave Battle infringes Rehco's patent. And deciding whether the non-adjudicated products mimic the accused products, the Battle, or something else entirely, simply is not possible without evidence. Certainly, resolving the parties' dispute in the context of post-trial motions, without any evidence, would be improper. Whatever the jury believed, the '866 patent does not give Rehco a blanket right to royalties on all hovering products.

Given this record, the Court rejects Rehco's request for royalties on unadjudicated products.

### 4.  Enhanced Damages for Willfulness

In its verdict, the jury determined that Spin Master's infringement of the '866 patent was willful. [286] at 6. Based upon this finding, Rehco asks the Court to treble the jury's damages award. The Court declines to do so.

Upon a finding of patent infringement, a court "may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. But increased

damages "are not to be meted out in a typical infringement case'"; rather, such damages "are instead designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016). In *Halo*, the Court observed that the "sort of conduct warranting enhanced damages has been variously described in our cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate"; "such damages are generally reserved for egregious cases of culpable behavior." *Id.* This is not such a case.

Indeed, even when a jury returns a verdict finding willfulness, enhanced damages are not automatic. *WCM Indus., Inc. v. IPS Corp.*, 721 Fed. App'x 959, 972 (Fed. Cir. 2018). As with "any exercise of discretion, courts should continue to take into account the particular circumstances of each case in deciding whether to award damages, and in what amount." *Halo*, 136 S. Ct. at 1933. Courts considering enhanced damages consider nine factors: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the infringer's size and financial condition; (5) the closeness of the case; (6) the duration of the infringer's misconduct; (7) any remedial action by the infringer; (8) the infringer's motivation for harm; and (9) whether the infringer attempted to conceal its misconduct. *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 827–

28 (Fed. Cir. 1992); *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.,* 875 F.3d 1369, 1382–83 (Fed. Cir. 2017).

Here, the evidence showed that Spin Master believed its products did not infringe. Rehco introduced evidence showing that Spin Master knew at some point that Toytec had not applied for or secured a patent, but these emails also explained why Spin Master believed its products did not infringe the '866 patent. Rehco emphasizes Dr. Spenko's testimony that Spin Master launched products after the '866 patent issued and even after Rehco sued for infringement. But that evidence, without more, does not demonstrate perniciousness; on the contrary, such behavior is entirely consistent with a good faith belief of non-infringement. Additionally, although the evidence showed that Spin Master may have been considering Rehco's flying astronaut at the same time it was working with Toytec, no one testified (and Rehco introduced no evidence to suggest) that looking at or considering prototypes from multiple inventors at the same time breached any protocol, violated any rule (written or unwritten) in the toy industry, or otherwise evidenced bad faith. On the contrary, Ben Dermer testified that this practice was common. [291] at 107–08.

Rehco also argues that Spin Master tried to cover up its infringement, citing evidence where Spin Master refused to provide access to proprietary information and documentation. But the trial evidence showed that such refusal only occurred after Rehco had accused Spin Master of infringement, suggesting that Spin Master's decision arose from a routine litigation precaution. [291] at 78. The trial evidence further showed that Toytec manufactured the Vectron Wave, told Spin Master it had

protected its control system technology, and received a 3% royalty from Spin Master. Rehco never sued Toytec for infringement.

Rehco also argues that Spin Master did not have a good faith invalidity argument. This Court disagrees. Although Spin Master's argument did not prevail on summary judgment, it was nonetheless colorable and certainly was not frivolous.

To support its claim for enhanced damages, Rehco argues that Spin Master did not act consistent with the standards of behavior in the industry because it failed to pay royalties to the inventors. But the evidence showed that Spin Master *did* pay inventors and had paid the Rehkempers millions over the years, including during this litigation. Steve Rehkemper and Ben Dermer both testified that Rehco and Spin Master had a mutually beneficial relationship for years, basically until this dispute. *See id.* at 22–24, 111–12 (Dermer); [292] at 93–95, 116 (Rehkemper). Steve Rehkemper testified that Spin Master paid Rehco the $40,000 advance payment owed under the Helicopter Agreement and paid all royalties owed on the Sky Patrol; Spin Master even paid Rehco royalties on the Helix, a product the Rehkempers did not invent, because the Helix built on their work. [292] at 96, 101. Spin Master continued to pay Rehco royalties throughout this litigation. *Id.* at 116. Ben Dermer testified that, from 2006 (when Spin Master started tracking royalty payments) to the present, Spin Master paid Rehco $6.8 million in royalties; he also testified that Spin Master paid the bulk of royalties to Rehco before 2006. [291] at 148. In short, the evidence shows that Spin Master has paid Rehco millions in royalties, and the suggestion that

Spin Master shirks its obligation to pay royalties to inventors is not well-supported in the evidence.

This was a hard-fought, hotly-contested case involving factual and legal issues about which reasonable minds could differ. *See* [187] at 32–47. The parties litigated this case in good faith and the testimony of the Rehkempers and Spin Master's representatives shows that the parties had a decent working relationship and a mutual respect, outside of their dispute about the '866 patent. The jury's willful finding notwithstanding, neither the evidence nor the parties' litigation conduct justify a punitive, vindictive damages award. [292] at 27. Accordingly, the Court denies Rehco's request for enhanced damages.

### 5.   Exceptional Case/Attorney's Fees

In addition to seeking enhanced damages, Rehco asks the Court to find that this case is "exceptional," meriting an award of attorney's fees. [298] at 25. The issue is significant, as the parties have been litigating this case for seven years, and any fee award would be substantial.

Pursuant to the Patent Act's fee-shifting provision, a district court "in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. "An 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Elec. Commc'n Techs., LLC v. ShoppersChoice.com, LLC*, 963 F.3d 1371, 1376 (Fed. Cir. 2020) (quoting *Octane Fitness, LLC v. ICON Health &*

*Fitness, Inc.*, 572 U.S. 545, 554 (2014)). Determining whether to award attorney fees under § 285 requires a two-step analysis in which the court first decides whether the prevailing party has shown by clear and convincing evidence that the case is "exceptional." *Lee v. Mike's Novelties, Inc.*, 543 F. App'x 1010, 1017–18 (Fed. Cir. 2013) (citing *Forest Labs., Inc. v. Abbott Labs.*, 339 F.3d 1324, 1327 (Fed. Cir. 2003)). If a court makes an exceptional case finding, it must then decide whether an award of attorney fees is appropriate. *Forest Labs*, 339 F.3d at 1328. The Federal Circuit has "repeatedly identified as 'exceptional' those cases involving inequitable conduct before the [Patent Office]; litigation misconduct; vexatious, unjustified, and otherwise bad faith litigation; a frivolous suit or willful infringement." *Id.* at 1329 (citations omitted). The decision whether to award fees is committed to the discretion of the trial judge, and even "an exceptional case does not require in all circumstances the award of attorney fees." *Modine Mfg. Co. v. Allen Grp., Inc.*, 917 F.2d 538, 543 (Fed. Cir. 1990). If a court finds a case to be exceptional, but nonetheless declines to award fees, it must explain its reasons. *Id.* (affirming district court's decision to decline fee award despite exceptional case finding, given the court's explanation).

Under the requisite standard, this is not an exceptional case. As explained above, Spin Master's handling of this case—both the underlying facts and the litigation itself—counsels against enhanced damages. For the same reasons, the Court declines to find this case exceptional. The facts presented at trial confirm that Spin Master did not act in bad faith. And other than the fact that it lost at trial, nothing demonstrates any exceptional culpability on Spin Master's part. The Court

declines to find this case exceptional, declines to award attorney's fees, and denies Rehco's request for a judgment that includes same.

### C. Pre-Judgment Interest

Rehco asks the Court to award pre-judgment interest on both its breach of contract and infringement claims. [298] at 22 (breach of contract), 24 (infringement). As to the contract claim, based upon the findings above, this Court denies the request.

As to the infringement claim, Rehco asks the Court to award pre-judgment interest at the prime rate, compounded annually. *Id.* at 24. Rehco seeks $1,555,926.14 in pre-judgment interest and represents that such interest will continue to accrue at approximately $899.05 per day through the date of judgment. *Id.;* [298-2] at 6, 14. Rehco's prejudgment interest calculation starts in 2010, the first full year of sales of Spin Master's infringing products. [298-2] at 14. Spin Master does not dispute Rehco's entitlement to pre-judgment interest. It argues, however, that any prejudgment interest calculation should be limited to the period after Rehco filed suit and that such interest should be calculated at the T-Bill rate. [304] at 19.

The Court agrees that Rehco is entitled to pre-judgment interest on its infringement claim. *See Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 656–57 (1983) (generally speaking, prejudgment interest should be awarded under § 284 absent some justification for withholding such an award, for example, undue delay in prosecuting the case); *Comcast IP Holdings I LLC v. Sprint Commc'ns Co., L.P.*, 850 F.3d 1302, 1313 (Fed. Cir. 2017) (courts ought to award prejudgment interest under § 284 "absent some justification for withholding such an award").

31

In terms of the specifics of an award, the rate of prejudgment interest and whether it should be compounded or uncompounded are matters left largely to the discretion of the district court. *Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 288 F. Supp. 3d 872, 905–06 (E.D. Wis. 2017) (citing *Bio–Rad Labs., Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 969 (Fed. Cir. 1986)). In "exercising that discretion, however, the district court must be guided by the purpose of prejudgment interest," which is to compensate the patent holder for the use of royalty funds it would have had, but for defendant's infringement. *Id.* In the Seventh Circuit, the prime rate is the "benchmark for prejudgment interest"; the Court sees no reason to deviate from that rate here. *See, e.g., First Nat. Bank of Chi. v. Standard Bank & Trust*, 172 F.3d 472, 480 (7th Cir. 1999) (court should depart from the prime rate only when it "engages in 'refined rate-setting' directed at determining a more accurate market rate for interest").

Nor is the Court persuaded that it should reduce its award based upon any delay in filing suit. As the Court noted above, after Rehco raised the issue of infringement, Spin Master defended itself, and the parties went back and forth explaining their respective positions. In light of this record, the Court cannot fault Rehco for waiting to actually file suit. Accordingly, the Court will accept Rehco's pre-judgment interest calculation on the infringement claim.

### D.    **Post-Judgment Interest**

Rehco also seeks post-judgment interest under 28 U.S.C. § 1961—that is, computed daily at a rate equal to the weekly average 1-year constant maturity

Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment, compounding annually. Spin Master does not dispute that Rehco is entitled to post-judgment interest calculated on this basis. Accordingly, the Court grants Rehco's request and finds that Rehco is entitled to post-judgment interest on its infringement claim, calculated consistent with 28 U.S.C. § 1961.

### E. <u>Prevailing Party Status</u>

Finally, Rehco asks the Court to find that it "prevailed" and is therefore entitled to costs. Absent a contrary federal statute, rule, or court order, "costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). A party "prevails" within the meaning of Rule 54(d) "when a final judgment awards it substantial relief." *Smart v. Local 702 Int'l Bhd. of Elec. Workers*, 573 F.3d 523, 525 (7th Cir. 2009). In light of the Court's rulings today, the Court finds that Rehco prevailed (and is thus entitled to costs) on its patent infringement claim. The parties shall meet and confer on costs, as well as the precise pre- and post-judgment interest calculations.

## IV. <u>Conclusion</u>

For the reasons explained above, the Court declines to disturb the jury's verdict on Rehco's patent infringement claim but finds that the jury's verdict on Rehco's breach of contract claim cannot stand. The Court denies in its entirety Spin Master's motion for judgment as a matter of law [299] and denies Spin Master's motion for new trial [300] as to the patent infringement claim but grants the motion for new

trial [300] as to the breach of contract claim. The Court declines to enter judgment on Rehco's breach of contract claim and declines to award enhanced damages, royalties on unadjudicated products, or attorneys' fees and, accordingly, denies Rehco's Rule 54 motion [298] to that extent. The Court finds that Rehco is entitled to judgment on the patent infringement verdict, as well as pre-judgment interest, post-judgment interest, and costs on its patent infringement claim, as set forth above. The Court lacks the necessary information to enter judgment at this time, however, and directs the parties to meet and confer on the specific interest calculations and on costs and submit a joint status report by December 15, 2020 memorializing their agreement (or competing positions) on these amounts. The case is set for a telephonic status hearing on December 17, 2020 at 11:00 a.m. to finalize the judgment amount and to discuss any remaining issues, including potential dates for any new trial on Rehco's breach of contract claim.

Dated: November 30, 2020

Entered:

John Robert Blakey
United States District Judge